[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

No. 20-10373

————————————————

UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

*versus*

ANDREW THOMPSON,
a.k.a. Nico,
ALFONZO CHURCHWELL,
a.k.a. Boo Boo,
JORDAN RODRIGUEZ,
a.k.a. Big Man,

                                        Defendants-Appellants.

————————————————

Appeals from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:18-cr-00205-WFJ-TGW-3

_____

Before GRANT, LUCK, and HULL, Circuit Judges.

LUCK, Circuit Judge:

Jordan Rodriguez, Alfonzo Churchwell, and Andrew Thompson were members of a gang called "Third Shift" that sold drugs, robbed, fought with rival gangs, and murdered in furtherance of the gang's operations. They were charged with a slew of crimes that the gang committed, convicted of most of them, and sentenced to life in prison. They now appeal their convictions, challenging the sufficiency of the evidence, an evidentiary ruling, the jury instructions, the district court's response to a jury question, and comments the district court made about Rodriguez's counsel's strategic choices. After careful review, and with the benefit of oral argument, we affirm their convictions.

# FACTUAL BACKGROUND[1]

### *The Third Shift gang*

The Third Shift gang was based in Oneco, a suburb of Bradenton, Florida. Rodriguez, Churchwell, and Thompson were members of Third Shift. Rodriguez and Thompson were childhood friends. Rodriguez's sister Maryha—who was also Thompson's ex-girlfriend—described the two as "best friends" and said Thompson was Rodriguez's "little do-boy," meaning Thompson "would always choose [Rodriguez], always, even with risking his family." Thompson's brother-in-law, Johnny Cintron; Cintron's friend, Phillip Uscanga; Uscanga's friend, Raymy; Rodriguez's brother, Jesse; and a man known as Macho were Third Shift members too.

Cintron testified to seeing Rodriguez "rep" Third Shift—"[t]hrowing up gang signs [and] stuff like that"—"and talk about being in the gang." Cintron said the gang's sign was "like an A-ok sign"; the gang also had a color (black), an "affiliated" or "friendly gang[]" (North Side), and a "rival gang[]" (South Side). Cintron saw Thompson "throw up the gang sign" and wear the gang's "flag" ("a black bandanna"). And he heard Macho sing a Third Shift song.

---

[1] "[W]e recount the facts . . . in the light most favorable to the government and draw all reasonable inferences in favor of the jury's verdict." *United States v. Martin*, 803 F.3d 581, 585 n.1 (11th Cir. 2015).

4                    Opinion of the Court                    20-10373

*The trap house*

Third Shift operated a "trap house"—a place where people "go[] to purchase drugs and use drugs on [the] premises"—on 11th Street East in Oneco.  J.R., Churchwell's "close" friend and a "big hitter" drug dealer in the Bradenton area, "opened" the trap house and "put[] his man [Rodriguez] in there" to "make some money." Rodriguez lived there, paid rent and utilities, and was "in charge." According to Cintron, Rodriguez ran the trap house from mid-2015 through late 2016 and had no other job.

During that time, Rodriguez, Cintron, Jesse, and other Third Shift members hung out at the trap house "[a]lmost every day." Pole cameras (installed by local law enforcement in June 2016) captured Thompson at the trap house several times, and both Cintron and Thompson himself testified that Thompson was there about once a week.  Cintron saw Churchwell at the trap house "[a] couple days," and Cintron and Jesse's friend, Quentin Couch, saw Churchwell there too.

The members of Third Shift sold drugs from the trap house. In fact, Stephanie Brewer—the trap house's housekeeper—said buying and using drugs was "the main thing that went on in th[e trap] house."  Rodriguez's neighbor testified to seeing "a lot of traffic" coming and going, and a lot of "[p]eople hanging out," at the trap house.  Pole camera footage similarly showed "lots of short-term traffic"—by car, bicycle, and foot—with people visiting the trap house "at all hours of the day and late into the night and the

early morning hours," often for less than four minutes. A law enforcement search on September 11, 2016, revealed drug paraphernalia around and throughout the trap house—including a digital scale, syringes, glass pipes, a plastic pill bottle, plastic gloves, and plastic baggies—plus containers of cash. A later search turned up more syringes, as well as a duffle bag containing "a bunch of pill bottles" holding "numerous unidentified pills and also narcotics."

J.R. would cook crack cocaine at the trap house a few times a week, after which Rodriguez would "break[ the crack cocaine] down into small pieces," "separating them and organizing them" on the kitchen table. Rodriguez kept drugs—crack and powder cocaine, marijuana, heroin, and pills, "[a]nything that you needed"— in a backpack in his bedroom and sold them from the trap house's kitchen or living room multiple times a day. He sold to Cintron a few times a week and he twice enlisted Cintron to sell marijuana and crack cocaine on his behalf when Rodriguez was busy. Couch said he bought marijuana from Rodriguez at the trap house "[m]ore than probably like a hundred times," and Maryha bought marijuana from Rodriguez too. Shazlynn Dunton (Thompson's girlfriend) bought marijuana and cocaine from Rodriguez, and Brandi Simon admitted both to buying marijuana and crack cocaine from Rodriguez and to paying him to use a room at the trap house to take pills or shoot Dilaudid.

Pole camera footage from January 2017 showed Rodriguez dealing drugs out of a van parked in front of the trap house. When officers initiated a traffic stop of the van shortly after observing the

drug transactions, they discovered marijuana, "several bags of crack cocaine," powder cocaine, narcotics, unlabeled prescription pill bottles, baggies, a scale, two rifles, a handgun, a pistol, a holster, ammunition, a baton, zip ties, a flashlight, and around $3,700 cash. Rodriguez would later tell a cellmate at FCI Coleman Low that he had sold marijuana and heroin from the trap house.

Others, including Churchwell and Thompson, sold drugs from the trap house too. Brewer testified that Rodriguez "had men underneath him"—"younger boys"—selling drugs at the trap house. Cintron admitted he started selling crack that he bought from Rodriguez because he "was just there, and [he] would see how many people would come[, s]o [he] just started doing it also." Rodriguez knew he was selling from the trap house, Cintron said, but Cintron "never had to get [Rodriguez's] permission."

Cintron also saw Churchwell at the trap house "[a] couple days" selling crack and heroin. Churchwell received and sent text messages arranging sales of heroin and molly too. And when Churchwell was arrested in September 2016, multiple baggies containing heroin were confiscated from him.

As for Thompson, he admitted to selling drugs for Dunton a few times "when it wasn't available or convenient for her to handle her business." But Maryha testified that she saw Thompson sell marijuana, Kyle Stackhouse (another drug dealer who knew Thompson from the neighborhood) saw him sell crack cocaine, and Dunton saw Thompson sell methamphetamine as well.

Thompson and Churchwell sometimes sold drugs they had purchased from Rodriguez; other times, they sold drugs they'd procured elsewhere.

*Rodriguez*

Rodriguez flaunted his gang activities on social media. His posts regularly referenced "thug life" and "G shit." In April 2016, Rodriguez posted: "im out here tryna grind in each and every way, stackin up my paper tryna avoid catching a case." And a few days later, he posted:

> i been thuggin it since i was 14, i swear i couldnt stay out the court scene . . . . i get out there and thug it cause i aint no ones concern . . . . i aint had a job in so long cause all i know is the streets.

Rodriguez also posted about using firearms and other forms of violence. For example, about a week after a January 2016 drive-by shooting we discuss in detail below, Rodriguez posted a status update declaring:

> I play this game well I feel like its monopoly, except I'm grinding hard I don't see nothing stopping me, tossin out that money like I'm some kind of slot machine, keep ya eyes to yaself before u hear that choppa scream, 100 round drum and its fully loaded, take me as a joke but ima shoot it if I tote it.[2]

---

[2] "Choppa" (or chopper) is street slang for an assault rifle.

A few days later, he updated his status:  "It's time to leave state cause [n-words] is gna make me go Rambo dog g shit."  Then, in April 2016, he commented:  "i been in oneco my whole life and these hoes really got shit fucked up talking like they bad cause ill make them disapear."

Rodriguez used his social media to complain about—and even taunt—snitches too.  In one status update, he said:  "Facebook gangster right here [n-word] my adress is 5832 11th street east came fade"—that is, "come fight"—"if u want it [n-word] aint nobody scared [n-word] but believe me if u pull a gun im killing yo ass [n-word], fuck talking run up."  Similarly, a few weeks after the January 2016 drive-by shooting, he challenged people who "think they hard but wna talk to the police and snitch":  "I stay on 11th street come my way with that p**** shit dog I know real crips that'll check yaw ass."  Later the same day, he sent a message ranting about people "who act gangsta but they wna talk to police when gangsta shit goes down bruhh I just needa get out of state before I catch a charge for fukin somebody up dog."

Apart from posting on social media, Rodriguez protected the trap house in numerous ways.  The refrigerator—which the September 2016 search revealed to contain beer and a drawer of money—was secured with a lock.  He had Brewer (the house-keeper) periodically "go in"—"[e]verybody that was [there] using [drugs] had to get out"—and "bleach and clean the whole trap house."  She'd "bleach everything down," "bring out" all the drug "paraphernalia," and collect anything of "monetary value" to "give

20-10373                Opinion of the Court                    9

back to the house man."   Rodriguez or J.R. paid Brewer with "[m]aybe just a little spending money but mostly with drugs."

Rodriguez also installed security cameras outside the trap house, and a TV in the living room displayed a live feed of the surrounding area.  And he supplied countless firearms, teaching Third Shift members to wipe ammunition clean of fingerprints before loading them.  Cintron saw "[a]n AK, a shotgun . . . [i]n the living room," and "a couple pistols" (specifically, a revolver and a "regular" 9-millimeter).  Couch saw an FN gun, a "mini Draco"—"[a] mini chopper, like a mini AK"—and a "little Warthog gun," all belonging to Rodriguez.  The September 2016 search turned up a semiautomatic handgun, plus holsters, magazines, ammunition (of various calibers, including rifle ammunition and shotgun shells), and spent casings throughout the trap house.

Lots of people handled Rodriguez's firearms while at the trap house.  According to Brewer, "whoever was in the[ trap house] usually had [Rodriguez's] guns on them," and Cintron said he "would go in and just pick [the revolver] up" himself.  Cintron recalled Rodriguez and his brother Jesse holding the firearms; he also saw Thompson "grab the [AK-47] and play with it" when he stopped by the trap house.  Pole camera footage confirmed this, showing Rodriguez and Thompson armed—Thompson with a "rifle-style firearm," at one point—while around the trap house.  And Thompson admitted, while testifying, that he "handle[d] assault weapons" both at Rodriguez's house and at his own.  Maryha testified that Thompson "kept a lot of guns at [their] house" and

would "[p]lay with them, . . . [p]oint[ing] the lasers on [the] guns" at police vehicles; Stackhouse likewise testified that Thompson once "rode by [on a bicycle] and pointed [an AK-38 or 40] at the truck [Stackhouse] was sitting in."

### The gang's murders

Theft and violence went hand in hand with Third Shift's drug business. Cintron testified that members of Third Shift "regularly committed thefts." A Manatee County deputy described seeing Thompson take a bike—then quickly replace it after noticing he was being watched. And Maryha and Dunton both recalled Thompson bragging about committing robberies. After one robbery—during which Third Shift members stole "a TV and a pistol and some money"—Rodriguez "threatened to slap the shit out of" Cintron's sister for calling the police.

Third Shift members also engaged in gun fights. And they murdered rival gang members, other drug dealers, and even complaining customers. Three of those murders are relevant to this appeal.

### Rodriguez's murder of Julio Tellez

First, Rodriguez killed Julio Tellez, a rival gang member, during a drive-by shooting. On the morning of New Year's Day, 2016, two Third Shift members—Cintron and Uscanga—drove Uscanga's red Mustang convertible, top down, to a corner store to buy cigars. Members of their rival gang, South Side, were at the store. Third Shift was "always in altercations with" South Side, and

this New Year's Day was no different.  Two South Side members attacked Cintron with a long wooden stick outside the store and then fled in a minivan after Cintron overpowered them.

Cintron and Uscanga chased the minivan all the way back to a "South Side gang member's house," "telling [them] to pull over"—and at one point Cintron threw a water bottle through the van's open window.  Cintron recognized the house from "a prior time when [he, his brother, Macho, and Jesse] got into an altercation over there."  That time, "[a] bunch of dudes came out with guns"; so Cintron, unarmed but worried there might again be armed South Side members at the house, decided to abandon the chase.  He and Uscanga instead went to retrieve Uscanga's gun from fellow Third Shift member Raymy, and then the three went to the trap house for ammunition.

The house the minivan fled to, it turns out, belonged to Tellez; the South Side members went there because Tellez had told them "he would have [their] backs" if they "ever needed anything." When they arrived, though, Tellez sent them away:  he didn't have any firearms on hand and "didn't want nothing to do with what they had going on."  But because "he felt like some trouble was going to happen," Tellez summoned help from his friend Eliceo Santoyo, who brought over a 9-millimeter Beretta and an SKS.

Meanwhile, at the trap house, Cintron told Rodriguez and Macho about the fight at the corner store and got ammunition from Rodriguez (who had supplied him with bullets before).  The Third Shift members hatched a plan to retaliate for the attack:

Uscanga would drive Cintron and Raymy by Tellez's house in the red Mustang—top up this time, "[s]o [the men] couldn't be seen"—and Cintron (the only one armed in the car) would "just start shooting" to lure people out of the house.  Then Rodriguez would drive his blue Honda by the house, with Macho (unarmed) in the passenger seat, and "finish the job"—"mean[ing] whoever came out[, Rodriguez] was going to start shooting at."

Things went exactly as planned.  As Uscanga drove the red Mustang past Tellez's house, Cintron shot into the empty yard.  Cintron's shots drew Tellez, Santoyo, and Tellez's friend Juan Montoya outside from the living room; they didn't return fire because the Mustang "was already kind of far down the road" by then (and because Santoyo noticed some children playing nearby).  Then, as the men started heading back inside the house, Rodriguez "rolled up and parked [the Honda] in front of the house," "halfway in the road, halfway in the driveway."  Rodriguez reached across Macho and fired through the passenger-side window, killing Tellez and wounding Montoya.  When Santoyo fired back, Rodriguez fled.  Macho would later complain to Cintron about being burned by shell casings when Rodriguez fired over him from the driver's seat.

After the murder, the Third Shift members returned to the trap house.  Cintron recalled Rodriguez telling him that the initial shots had lured people out of Tellez's house but "they were focused on [the red Mustang], and [Rodriguez] got the upper hand on them and started shooting," after which Rodriguez "saw a body

drop." Rodriguez admitted to Couch—and later to his cellmate at Coleman Low—that he shot Tellez. Rodriguez also bragged to the gang members that he had shouted "Fuck South Side" as he shot Tellez. And Rodriguez told the others there was a bullet hole in his Honda; Cintron saw the hole in the car's right back fender. Rodriguez eventually told Cintron that he had the Honda fixed at a body shop before selling it. DMV records confirmed that Rodriguez sold the car three weeks after the shooting, and officers examining the car discovered both visible gunshot damage to the trunk's interior and an area "on the passenger side just above the taillight" with "a lighter blue" exterior paint. According to Cintron, Rodriguez disposed of the guns used in the shooting too.

### Churchwell's murder of Earnestine Gardner

Second, Churchwell murdered Earnestine Gardner in the front yard of the Third Shift trap house. The morning of September 11, 2016, Couch saw Churchwell at the house armed with one of Rodriguez's revolvers. Brewer, the trap house's housekeeper, arrived early that morning to find Gardner "arguing with [Churchwell] out front" about being shorted ten dollars in change after Gardner bought cocaine from Churchwell.

Rodriguez was sleeping at the time. Because Brewer was worried the argument would attract the police's attention, she sent someone to wake up Rodriguez in hopes that he'd "diffuse[]" the situation. When Rodriguez went outside, Churchwell came inside and sat beside Brewer in a pair of chairs near the kitchen. Shortly

after, Gardner "came in[side] . . . and walked straight to [Church-well] . . . and stood right up over him." Gardner told Churchwell she was "gonna show [him that she] don't play about [her] money"; then she walked back outside.

"[A]s soon as [Gardner] got through the threshold of the door," Churchwell stood up, went to the doorway, then turned back to look at Brewer. He "looked at [Brewer] for three long seconds," silent, before "pull[ing] his .45 and turn[ing] around and [shooting Gardner] in the back." According to Brewer, Churchwell then "walked up on [Gardner] and he shot her three more times." Pole camera footage showed Churchwell fleeing on foot; he would later admit to his cellmate at Coleman Low that he had shot Gardner. Gardner died at the hospital from her injuries.

Rodriguez called 911 at 6:38 a.m.—about two minutes after Gardner was shot. Even though he was standing close to Churchwell when Gardner was murdered, Rodriguez told law enforcement officers that he had been sleeping when he heard gunshots outside his house, hadn't seen the shooter, and didn't know who the victim was. And even though Churchwell and Rodriguez had called each other nineteen times on the day of Gardner's murder, Rodriguez later told the police that he didn't know who Churchwell was either. Rodriguez texted Churchwell a few times that day too, including sending a message at 9:23 a.m. reading "Bruh call me u str8."

20-10373                Opinion of the Court                15

Several months after Churchwell was arrested for Gardner's murder, he called Rodriguez several times from jail. In a mid-November 2016 call, Rodriguez told Churchwell he got his security-camera DVR back from the police. Churchwell said he was "shitting for a minute," but Rodriguez assured him that "we straight" because the DVR "ain't have nothing" on it, so "all the[ police] got is [Brewer]." Churchwell also said that if he could figure out who had been at the trap house the day of Gardner's murder, then his "private investigator" could "talk to people" and "verify" Churchwell wasn't there. Rodriguez said "I gotcha[] bro. I'll have people call." Churchwell later told Rodriguez that his investigator could "get everybody . . . [r]ounded up. . . . Boom, boom, boom, you know what I'm saying?" Rodriguez responded "Yeah."

"[O]utta everybody," Churchwell said, Rodriguez "keep[s] it the real[e]st"—"when I came . . . back from court, bro, I was like, damn, bro showed up for real, baby"—and Churchwell was "gonna carry that back to" Rodriguez, telling him: "[Y]ou got a [n-word] on your team, boy, that's gonna ride or die about you now . . . . I'd spill my blood for you, boy. . . . I'm fixing to ride for a [n-word], bro, that's what it is, [n-word]. That's what it is. You ain't gotta worry about nothing now. Straight up." "I be wanting you to get the fuck up outta there," Rodriguez responded. Rodriguez also commented that the police suspected Churchwell of Gardner's murder because "[Churchwell] already got a previous charge . . . so they already looking at it, like, yeah, he capable of it 'cause he already did it."

Later, in January 2017—during what Churchwell warned would "be the last time [he] call[ed]"—Churchwell asked Rodriguez whether he "got rid of [Churchwell's] three-wheeler, you feel me, that three-wheeler." "[N]othing else" was worrying him, Churchwell said. Rodriguez assured Churchwell that it was already "gone." In that case, Churchwell said, "don't worry about nothing. You know what I'm saying? My lawyer said we good, bro." A Manatee County Sheriff's Office detective who listened to the jail call testified that the meaning of "three-wheeler" was "unknown" but that he "highly doubt[ed]" Churchwell meant a bike.

### Thompson's murders of Berry Joseph and Lashawna Stevenson-Weeks

Third, Thompson murdered Berry Joseph and LaShawna Stevenson-Weeks. Joseph was a local drug dealer from whom Thompson and his girlfriend Dunton bought cocaine. In January 2017, Thompson told Dunton he was going to see Joseph to repay a debt. Thompson drove off, armed and wearing a hat, in Dunton's Pontiac G6 to meet Joseph. Thompson met Joseph in a parking lot, followed him back to Joseph's house, and parked next to Joseph's Explorer.

A neighbor across the street saw, from her porch, the two vehicles parked in Joseph's driveway. She reported seeing one person inside Joseph's Explorer and two men—one wearing a red hat—standing next to it. The neighbor heard a gunshot, saw a person lying on the ground while the man with the red hat leaned into Joseph's Explorer, and then heard more gunshots. The man in the

red hat then drove away in the Pontiac, "[n]onchalant, like nothing happened." The neighbor would later identify Thompson as the shooter in a photo line-up, and officers would match prints collected from the Explorer's front driver's side window to Thompson. The man lying on the ground by the Explorer was Joseph, and the person in the vehicle was Stevenson-Weeks; both died from gunshot wounds.

Starting about forty-five minutes after the murders—and continuing throughout the next two and a half hours—Thompson and Rodriguez spoke by phone eight times (and a ninth by text). During that time, Rodriguez used his own car to drive Thompson back to Thompson's house. Thompson burned his clothes on a grill as soon as he got home. While Thompson was showering, Dunton went into their living room to inspect the dark-colored "men's toiletry bag or razor bag"—a description matching the bag Joseph used to carry his drugs—Thompson had brought into the house when he returned. Inside, she found powder cocaine, meth, and empty "little dime and nickel bags."

A bullet pierced the Pontiac's windshield during the shooting. But when Dunton asked where her car was, Thompson claimed it was being fixed because a tree branch fell on the windshield. A few days after the double-murder, Rodriguez texted and called to tell Thompson and Dunton that the Pontiac was fixed and ready to be picked up. Thompson testified that Rodriguez directed him to the body shop that repaired the damaged windshield.

Thompson confessed to Stackhouse that Thompson arranged to meet Joseph, "went to rob him" of his "[d]ope and money," and shot and killed Joseph and Stevenson-Weeks. Thompson admitted that, after the murder, he went to a carwash "because [the car] had blood speckled on the front fender," burned his clothes—but not his hat, which Thompson told Stackhouse "was on the dresser in the house when the police came and got him," but "they didn't bother the hat, . . . they left it on the dresser"—and spray-painted the car's tire rims a different color "so the car wouldn't match the description." Thompson also told Stackhouse that one of his shots broke the Pontiac's windshield— so "he took it to a shop to get the window fixed"—and another hit the car's door; police would later find a projectile inside the door, as well as a "projectile hole" covered with electrical tape.

## PROCEDURAL HISTORY

In July 2019, a grand jury returned a twenty-count indictment against Rodriguez, Churchwell, Thompson, and other codefendants who are not part of this appeal.

Count one charged Rodriguez, Churchwell, and Thompson with conspiracy to conduct and to participate in the affairs of a racketeering enterprise through a pattern of racketeering activity, in violation 18 U.S.C. section 1962(d). As overt acts in furtherance of the conspiracy, count one alleged that: (1) Rodriguez, Churchwell, and Thompson used the trap house to "maintain, manufacture, and distribute controlled substances" and to "maintain firearms";

(2) Rodriguez both "conspired to commit," and actually committed, a drive-by shooting resulting in Tellez's murder; (3) Rodriguez, Churchwell, and Thompson possessed (and Thompson also attempted to possess) with intent to distribute controlled substances; (4) Churchwell murdered Gardner; (5) Rodriguez and Churchwell conspired to obstruct the investigation into Gardner's murder; and (6) Rodriguez knowingly used and carried a firearm in furtherance of his drug trafficking crimes. Count one also gave notice of a series of "Special Sentencing Factors," alleging that: (1) Rodriguez killed Tellez "from a premeditated design . . . while attempting to murder another human being"; (2) Churchwell killed Gardner "from a premeditated design"; and (3) Thompson killed Joseph and Stevenson-Weeks "from a premeditated design . . . while perpetrating and attempting to perpetrate a robbery."[3]

Count two charged Rodriguez, Churchwell, and Thompson with conspiracy to distribute and to possess with intent to distribute a controlled substance, in violation of 21 U.S.C. sections 846 and 841(b)(1)(C).

Counts three through five charged Rodriguez with crimes related to Tellez's murder. In count three, Rodriguez was charged with "conspir[acy] to murder rival gang members" in aid of racketeering, in violation of 18 U.S.C. section 1959(a)(5). In count four,

---

[3] The indictment also alleged as special sentencing factors that Thompson murdered Demetrius Robinson and Florence Randall, but the jury acquitted Thompson of these allegations.

20                    Opinion of the Court                    20-10373

he was charged with murdering Tellez in aid of racketeering, in violation of 18 U.S.C. sections 1959(a)(1) and 2.  And in count five, Rodriguez was charged with using and discharging a firearm during Tellez's murder, in violation of 18 U.S.C. sections 2, 924(c)(1)(A)(iii), and 924(j)(1).

Count eight[4] charged Thompson with possession of a controlled substance with intent to distribute, in violation of sections 841(a)(1) and 841(b)(1)(C).

Counts nine through twelve charged Churchwell and Rodriguez with crimes related to Gardner's murder.  Count nine charged Churchwell with murder in aid of racketeering, in violation of section 1959(a)(1).  Count ten charged him with using and discharging a firearm during and in relation to (1) the drug trafficking conspiracy, (2) Gardner's murder in aid of racketeering, and (3) maintaining a drug distribution house, in violation of 18 U.S.C. sections 924(c), 924(c)(1)(A)(iii), and 924(j)(1).  As a sentencing enhancement under section 924(j)(1), count ten also alleged that Churchwell caused Gardner's death "by murder as defined in 18 U.S.C. [section] 1111, through the use of a firearm."  Count eleven charged Churchwell with possession of ammunition by a felon, in violation of 18 U.S.C. sections 922(g)(1) and 924(a)(2).  And count twelve charged Rodriguez as an accessory after the fact to Churchwell's offenses charged in counts nine through eleven, in violation of 18 U.S.C. section 3.

_____

[4] Counts six and seven involved coconspirators who are not part of this appeal.

Counts thirteen through nineteen charged Thompson and Rodriguez with crimes related to the murders of Joseph and Stevenson-Weeks. Count thirteen charged Thompson with attempt to possess with intent to distribute a controlled substance, in violation of sections 841(b)(1)(C) and 846. Counts fourteen and sixteen charged him with murdering Stevenson-Weeks and Joseph in aid of racketeering, in violation of section 1959(a)(1). Counts fifteen and seventeen charged Thompson with using and discharging a firearm during and in relation to (1) the drug trafficking conspiracy, (2) the attempt to possess and distribute a controlled substance charged in count thirteen, and (3) Stevenson-Weeks's and Joseph's murders in aid of racketeering, in violation of sections 924(c), 924(c)(1)(A)(iii), and 924(j)(1). As sentencing enhancements, counts fifteen and seventeen also alleged that Thompson caused Stevenson-Weeks's and Joseph's deaths "by murder as defined in 18 U.S.C. [section] 1111, through the use of a firearm." Count eighteen charged Thompson with possession of a firearm while subject to a domestic violence restraining order, in violation of 18 U.S.C. sections 922(g)(8) and 924(a)(2). And count nineteen charged Rodriguez as an accessory after the fact to Thompson's offenses charged in counts fourteen through eighteen, in violation of 18 U.S.C. section 3.

Finally, count twenty charged Rodriguez, Churchwell, and Thompson with aiding and abetting each other in the maintenance of a drug distribution house (the trap house), in violation of 18 U.S.C. section 2 and 21 U.S.C. sections 856(a)(1) and 856(b).

Rodriguez, Churchwell, and Thompson pleaded not guilty and proceeded to a thirteen-day jury trial in October 2019.

*Deputy Taylor's testimony about Thompson*

On day four of the trial, the government called Manatee County Sheriff's Deputy Austin Taylor to describe his interactions with Thompson. Before Deputy Taylor took the witness stand, Thompson argued that his expected testimony—which Thompson characterized as "generally" about "Thompson's disrespect for law enforcement"—was "excludable under [Federal Rule of Evidence] 403." The government argued that Thompson's lack of fear of, and "disrespect for[,] law enforcement" was probative of his "knowledge and intent to participate in the [racketeering] conspiracy." Observing that "[t]here's a fine line between . . . marking out your turf and screaming at the cops to protect your turf and having some free speech rights," the district court decided to "take it on the fly."

Deputy Taylor then testified that he saw Thompson with a rifle on two occasions. The first time, Thompson fired an AK-47 at pots and pans in a ditch near his house. The second time, Deputy Taylor responded to a "random shooting call" and saw "Thompson standing on his front porch with an AK-47 leaning up against [a] couch" a few feet away from him.

Deputy Taylor told the jury that he had "numerous encounters" with Thompson after the AK-47 incidents. When the government asked Deputy Taylor to describe Thompson's "behavior towards [him]" during these encounters, Thompson again objected

on rule 403 grounds. The district court overruled the objection "for now," and Deputy Taylor said that Thompson "initially tried to be polite" but, as the encounters progressed, Thompson's "demeanor tended to become more aggressive, basically like he didn't want to talk to us. And it was F this, F that, I don't need to talk to you type of thing." On cross-examination, Deputy Taylor couldn't recall Thompson ever threatening him; instead, he said, Thompson "was more so just belligerently speaking, upset with the situation type of discussion." Deputy Taylor also testified that he didn't arrest Thompson for any of the behavior he described.

### *The motions for a judgment of acquittal*

After the government rested, Rodriguez, Churchwell, and Thompson moved for judgments of acquittal.[5] We discuss here only the arguments relevant to this appeal.

Starting with Rodriguez, as to the racketeering-conspiracy charge (count one), he argued that the government failed to establish either the existence of an agreement to engage in a pattern of racketeering or two predicate racketeering acts. As to the drug conspiracy charge (count two), Rodriguez argued that there was insufficient evidence of a conspiracy because "everybody was doing their own thing," with the Third Shift members "all s[elling] their own stuff."

---

[5] In addition to making their own arguments, Rodriguez and Thompson adopted the other defendants' challenges to the sufficiency of the evidence.

As to the charges related to Tellez's murder (counts three through five), Rodriguez argued that there was no evidence he conspired to murder anyone (the plan was "to go over there and to have a fight"), he shot Tellez in self-defense, and Tellez's friend Santoyo didn't identify him as the shooter (when shown a lineup or in court).

As to the accessory after the fact charges (counts twelve and nineteen), Rodriguez argued that neither his jail calls with Churchwell nor evidence that he gave Thompson "a particular ride" home after the shooting of Joseph and Stevenson-Weeks showed that he was an accessory. Finally, as to the charge for maintaining a drug distribution house (count twenty), Rodriguez argued that the government failed to prove he "maintain[ed] a drug premises."

Turning to Churchwell, as to the racketeering-conspiracy charge (count one), he argued that the government failed to prove that he was a member of a racketeering enterprise. Churchwell also argued that the government failed to prove that he committed a second racketeering predicate act (in addition to Gardner's murder).

As to the drug conspiracy charge (count two), Churchwell argued that the government failed to prove that he conspired with Rodriguez and Thompson to possess and distribute drugs or that he was involved with them in selling drugs. As to count ten—the charge for using a firearm in relation to counts two (the drug trafficking conspiracy), nine (Gardner's murder), and twenty (maintaining a drug distribution house)—Churchwell conceded that the

government could proceed with respect to the murder predicate but disputed the sufficiency of the evidence proving counts two or twenty. Finally, as to the charge for maintaining a drug distribution house (count twenty), Churchwell argued the evidence showed he was only at the trap house "two or three times"—not enough for a "prima facie case regarding aiding and abetting."

Lastly, Thompson argued—as to the racketeering-conspiracy charge (count one)—that the government failed to prove the existence of a racketeering enterprise, that Thompson was a member of the enterprise, or that he committed any acts in furtherance of the enterprise.

The district court denied all three defendants' motions.

*The jury instruction for count twenty—maintaining a drug distribution house*

As part of its instruction for count one—the racketeering-conspiracy charge—the district court instructed the jury as to each "charged [predicate] racketeering activity," including the predicate act of "knowingly using or maintaining a place for the purpose of manufacturing or distributing any controlled substance." The district court specifically instructed the jury that,

> [t]o prove that a [d]efendant or another member of the enterprise committed this racketeering act, the [government] must prove that the [d]efendant knowingly and intentionally used or maintained a place for the purpose of manufacturing or distributing a controlled substance. The [government] is not required

> to prove that the drug activity was the [d]efendant's
> primary purpose[,] only that drug activity was a sig-
> nificant reason why the [d]efendant used or main-
> tained the place.

The district court elsewhere instructed the jury as to "which sub-
stances are controlled substances" and as to the meaning of "know-
ingly."

After completing its instructions for count one, the district
court "address[ed] the counts of the superseding indictment that
charge[d] crimes other than racketeering conspiracy." "Some of
these crimes," the district court instructed, "[we]re also charged as
racketeering acts, which I explained above." Then, when it in-
structed the jury on count twenty—maintaining a drug distribution
house—the district court told the jury: "I also previously instructed
you that it is a federal crime for anyone knowingly to use or main-
tain any place for the purpose of manufacturing or distributing any
controlled substance." The defendants did not object to the in-
structions for count one or count twenty.

*The justifiable use of deadly force jury instruction*

Rodriguez moved the district court to instruct the jury on
the justifiable use of deadly force. Rodriguez argued he was enti-
tled to the instruction based on evidence that he killed Tellez in
self-defense, including: (1) testimony that there were multiple
weapons at Tellez's home; (2) physical evidence at the scene (like
the spent shell casings) "suggest[ing] . . . a multitude of discharges
of ammunition"; and (3) proof that Rodriguez's blue Honda had a

20-10373                Opinion of the Court                    27

bullet hole in it after the drive-by shooting.  Rodriguez proposed an instruction based on Florida's standard jury instruction governing the justifiable use of deadly force:

> It is a defense to the crime of First Degree Premeditated Murder in violation of Florida law, including lesser-included offenses of First Degree Premeditated Murder[,] if the actions of the accused constituted the justifiable use of deadly force.  "Deadly force" means force likely to cause death or great bodily harm.

> The use of deadly force is justifiable if the accused reasonably believed that the force was necessary to prevent imminent death or great bodily harm to [the] accused while resisting:

> 1. another's attempt to murder [the] accused, or

> 2. any attempt to commit murder upon the accused.

The government objected to Rodriguez's proposed jury instruction, pointing out that Rodriguez omitted the part of Florida's standard instruction "that says . . . you can't start the fight":

> If the defendant was otherwise engaged in criminal activity, or was not in a place he or she had a right to be, then use or threatened use of deadly force was not justified unless he used every reasonable means within his power consistent with his own safety to avoid it.

Rodriguez responded that the "duty to retreat" portion of the instruction didn't apply because "he ha[d] a right to be in his car" during the drive-by shooting.

After reviewing Florida's standard instruction, the district court said that it would only give the instruction if the additional "engaged in criminal activity" language "com[es] in along with [Rodriguez's requested] part." Rodriguez decided he would rather "forego" the instruction.

*The jury's question about the racketeering charge*

During deliberations, the jury asked in a note: "Can the defendant be charged guilty of murder if they are not found guilty of racketeering? [O]r vice versa[?]" The district court interpreted the question as asking whether a defendant could be *convicted* of murder if he were not found guilty of racketeering.

The district court told the parties that, "[p]utting aside the vice versa thing," it believed the answer to the jury's question was no. The district court explained that, "as charged" in counts four, nine, fourteen, and sixteen (the murder in aid of racketeering charges),

> the government must prove that the defendant under consideration[,] for the purpose of maintaining an[d] increasing position in the enterprise engaged in racketeering activity, unlawfully and knowingly murdered the victim under consideration. So that would inherently require that the[ jury] find that there was an enterprise and the defendant's participation therein.

The government conceded that "certainly the [murders in aid of racketeering counts] do reference the racketeering enterprise" but objected to the district court's proposed answer because the defendants had "also [been] charged [with] murder under [section] 924(j)" in counts ten, fifteen, and seventeen. The government explained that murder in aid of racketeering was only one of three predicate acts charged in the section 924(j) counts, that each of those counts also included two drug trafficking offenses as predicates, and that the jury "c[ould] find one or more of those offenses apply to find guilt on th[e section 924(j)] count." The government also said that the jury's question was "ambiguous" about whether it meant "every count that references murder" or just the murder in aid of racketeering counts.

The district court agreed that the government had incorporated the 18 U.S.C. section 1111 enhancement into the section 924(j) firearm counts—charging that the defendants, "in the course of said [section 924(j)] violation[,] caused the death as murder"—and the section 1111 enhancement "does not require a finding of racketeering." But the district court decided not to address the firearms counts because, in its opinion, the jury was "asking [the district court] about convicting [the defendants] of murder," not firearms charges. The district court responded to the jury's question by telling it:

> Please consider the instructions as a whole and do not single out one part alone. The answer to your question is as follows:

As to the murder in aid of racketeering counts (counts 4, 9, 14, and 16), the government must prove beyond a reasonable doubt that the defendant under consideration, for the purpose of maintaining and increasing position in the enterprise, an enterprise engaged in racketeering activity, unlawfully and knowingly murdered the victim under consideration. So on those four counts the existence of the enterprise and the defendant's participation in it must be proven beyond a reasonable doubt.

Rodriguez didn't object to the district court's response to the jury. But two days later, he filed a motion "adopting" the government's position regarding the jury question. "[I]n short," Rodriguez argued, "a defendant can be found guilty of murder without the finding of racketeering." Then, the next day, Rodriguez withdrew his motion to adopt the government's position. Rodriguez "concede[d] that the [district court's] response to the jury's question [wa]s correct—although it d[id] not answer (as it should) part two of the jury's question as to whether a person can be guilty of racketeering but not guilty of murder."

*The district court's comment on Rodriguez's counsel's strategy*

While the jury was still deliberating—after Rodriguez filed his motion adopting the government's position on the jury question, but before he withdrew that motion—the district court held a phone status conference regarding a juror's request to be excused.

During the call, Rodriguez's counsel said that the district court's "note" in response to the jury's question about racketeering

and murder "need[ed] to be removed" if an alternate juror was seated. The district court said it was "not going to be removing the note," and then added:

> And we won't talk about it now . . . , but your strategy on this murder thing eludes me. There is nothing worse than judges playing lawyers because judges don't see the whole radar scope. I got that. I don't have 360 degrees of vision on this case.
>
> But one thought is if you say, and I think you have, that—well, you say now, you said today anyway that you don't need the racketeering finding for those murder counts. Okay, that's fine for some strategic reason that eludes me, but if you get convicted of one of those, are you then on appeal judicially estopped from saying well, gee, Judge in Atlanta, appellate panel, they never proved the racketeering. I don't know. Because you just basically now said, well, it's not needed to convict them of the murder. But I don't know whether—anyway.

Counsel for Thompson then said that he couldn't "express the level of [his] objections to [Rodriguez]'s motion that he filed in reference to the jury note." The district court responded:

> So noted. So noted. So it's okay. And if there were such a judicial estoppel on appeal, it certainly wouldn't bind you. I don't know if that doctrine even exists. But it seems to me if somebody gets convicted of murder, their best argument might be, well, there's a dead body but there's no racketeering. As I said,

there's nothing more dangerous than judges trying to play lawyers because we don't have a full 360-degree view of all the facts.

*The jury's verdict*

Four days later, the jury found Rodriguez, Churchwell, and Thompson guilty as charged, with only two exceptions. First, although the jury found Thompson guilty in count one of a racketeering conspiracy, and of murdering Joseph and Stevenson-Weeks as predicate acts, it did not find him guilty of murdering two other victims (Robinson and Randall) as predicate acts. Second, the jury acquitted Churchwell in count nine of murdering Gardner in aid of racketeering—and likewise rejected count nine as a predicate (1) in convicting Churchwell of using a firearm in furtherance of a crime of violence in count ten and (2) in convicting Rodriguez of being an accessory after the fact to Churchwell's crimes in count twelve. But the jury specifically found in count one that Churchwell murdered Gardner, that Rodriguez murdered Tellez, and that Thompson murdered Joseph and Stevenson-Weeks.

After the verdict, Thompson filed a renewed motion for judgment of acquittal arguing that his racketeering-conspiracy conviction was legally insufficient because *Brown v. United States*, 942 F.3d 1069, 1075 (11th Cir. 2019) (holding that conspiracy to commit robbery isn't a section 924(c) "crime of violence"), and *United States v. Davis*, 139 S. Ct. 2319, 2336 (2019) (holding that section 924(c)'s residual clause is unconstitutionally vague), required that "the cat-

egorical approach . . . be used when determining whether an offense qualifies [as a 'crime of violence'] under the [section 924(c)] elements clause." Thompson argued that his conviction in count one must be vacated because it's impossible to determine whether the jury's verdict "was based on a crime of violence that is unconstitutionally vague under *Davis* or inapplicable under *Brown*." The district court denied Thompson's renewed motion because "[i]t [wa]s clear that [section] 924(c) was not a predicate of the [c]ount [one] racketeering conspiracy, nor was the jury so charged."

The district court sentenced each defendant to multiple terms of life imprisonment, and each timely appealed.[6]

## DISCUSSION

Rodriguez, Churchwell, and Thompson challenge the sufficiency of the evidence underlying many, but not all, of their convictions. Thompson maintains that Deputy Taylor improperly commented on his silence. Churchwell contends that the district court failed to properly instruct the jury as to the charge for maintaining a drug distribution house. And Rodriguez argues that the district court erred in not giving his proposed justifiable use of deadly force instruction, in responding to the jury's question about murder and racketeering, and in commenting on his trial counsel's strategy. We consider each argument below.

---

[6] The defendants do not challenge their sentences on appeal.

*Sufficiency of the evidence*

"We review de novo the denial of a motion for judgment of acquittal, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences in favor of the jury's verdict." *Martin*, 803 F.3d at 587 (emphasis omitted). "[T]he issue is not whether a jury reasonably could have acquitted but whether it reasonably could have found guilt beyond a reasonable doubt." *United States v. Thompson*, 473 F.3d 1137, 1142 (11th Cir. 2006), *abrogated on other grounds as recognized in United States v. Di-Falco*, 837 F.3d 1207, 1216 (11th Cir. 2016). "The evidence need not be inconsistent with every reasonable hypothesis except guilt, and the jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial." *United States v. Poole*, 878 F.2d 1389, 1391 (11th Cir. 1989). Where "any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt," we will not overturn a jury's verdict. *United States v. Friske*, 640 F.3d 1288, 1291 (11th Cir. 2011) (citation omitted).

With these principles in mind, we now address Rodriguez's, Churchwell's, and Thompson's challenges to the sufficiency of the evidence.

Racketeering conspiracy (count one—all defendants)

It is "unlawful for any person . . . associated with any enterprise engaged in . . . interstate or foreign commerce[] to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C.

§ 1962(c). It is likewise "unlawful for any person to conspire to violate" section 1962(c). *Id.* § 1962(d). "Racketeering activity" includes "any act or threat involving murder, . . . robbery, . . . or dealing in a controlled substance . . . which is chargeable under [s]tate law and punishable by imprisonment for more than one year." *Id.* § 1961(1)(A).

"To establish a [racketeering-]conspiracy violation under 18 U.S.C. [section] 1962(d), the government must prove that the defendants 'objectively manifested, through words or actions, an agreement to participate in the conduct of the affairs of the enterprise through the commission of two or more predicate crimes.'" *United States v. Starrett*, 55 F.3d 1525, 1543 (11th Cir. 1995) (quoting *United States v. Russo*, 796 F.2d 1443, 1455 (11th Cir. 1986)). "The government may prove a defendant's agreement in two ways: (1) by showing an agreement on an overall objective, or (2) by showing that a defendant agreed personally to commit two predicate acts and therefore to participate in a 'single objective' conspiracy." *Id.* (cleaned up). "The government can prove an agreement on an overall objective by circumstantial evidence showing that each defendant must necessarily have known that others were also conspiring to participate in the same enterprise through a pattern of racketeering activity." *Id.* (cleaned up). "If the government can prove an agreement on an overall objective, it need not prove a defendant personally agreed to commit two predicate acts." *United States v. Abbell*, 271 F.3d 1286, 1299 (11th Cir. 2001).

"Regardless of the method used to prove the agreement, the government does not have to establish that each conspirator explicitly agreed with every other conspirator to commit the substantive [racketeering] crime described in the indictment, or knew his fellow conspirators, or was aware of all the details of the conspiracy." *Starrett*, 55 F.3d at 1544 (cleaned up). The government also "need not prove that the defendants . . . participated in every aspect of the conspiracy"; instead, it is enough to prove that the defendants "knew the essential nature of the conspiracy." *United States v. Garcia*, 405 F.3d 1260, 1269–70 (11th Cir. 2005) (citation omitted).

1. *Rodriguez*

Rodriguez argues that the evidence was legally insufficient to convict on count one because the government failed to establish (1) the existence of a criminal enterprise or (2) Rodriguez's agreement to participate in a pattern of racketeering activity. He maintains that the evidence "[a]t best . . . established a loose affiliation of persons that some might . . . consider a loose 'group of thugs.'" We disagree.

First, the government established that Third Shift was a criminal enterprise. A racketeering "enterprise includes any union or group of individuals associated in fact" and "a group of persons associated together for a common purpose of engaging in a course of conduct." *Boyle v. United States*, 556 U.S. 938, 944 (2009) (quoting *United States v. Turkette*, 452 U.S. 576, 580, 583 (1981)). "The government may prove a [racketeering] enterprise 'by evidence of an ongoing organization, formal or informal, and by evidence that the

various associates function as a continuing unit.'" *Starrett*, 55 F.3d at 1545 (quoting *Turkette*, 452 U.S. at 583).

In *Boyle*, the Supreme Court explained that "an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." 556 U.S. at 946. "[P]roof of an association's devotion to 'making money from repeated criminal activity' demonstrates an enterprise's 'common purpose of engaging in a course of conduct,' regardless of whether the criminal activity is diverse." *United States v. Church*, 955 F.2d 688, 698 (11th Cir. 1992) (citations omitted).

Here, there was sufficient evidence for a reasonable jury to conclude that Third Shift was an association-in-fact enterprise. Cintron testified that he, Rodriguez, and other Third Shift members spent time at the trap house "[a]lmost every day" from mid-2015 until the end of 2016. According to Cintron, Rodriguez sold drugs from the trap house "[e]very day," and pole camera footage (corroborated by Rodriguez's neighbor's testimony) showed lots of people making "short-term" (less than four-minute) visits at all hours of the day. The pole camera even captured Rodriguez dealing drugs from a van parked in front of the trap house—and police searches revealed drug paraphernalia, pills, and cash throughout the house. Indeed, Brewer (the housekeeper) testified that "the main thing that went on in that house" was "buying the drugs, using the drugs." Rodriguez bragged on social media about making

money from his crimes, using the phrases "thug life" and "G shit" and declaring:  "im out here tryna grind in each and every way, stackin up my paper tryna avoid catching a case."  He also bragged that he'd "been thuggin it since [he] was 14."

Other Third Shift members participated in the drug dealing too.  Brewer told the jury that Rodriguez had "men underneath him" selling drugs at the trap house.  Cintron, Thompson, and Churchwell all bought drugs from Rodriguez to sell, and Cintron sold drugs on Rodriguez's behalf a "couple times."

Rodriguez also provided guns for Third Shift members to use to protect the trap house—witnesses saw an AK, a mini AK, a shotgun, several pistols, an "FN gun," and a "little Warthog gun"— and taught them to wipe bullets clean of their prints before loading them.  Cintron said he, Thompson, and others were permitted to handle Rodriguez's weapons, and pole cameras captured Thompson armed while around the trap house.  In fact, Brewer testified that "whoever was in the[ trap house]" was armed.

Together, this evidence showed that Third Shift had a criminal purpose, relationships among those associated with it, and sufficient longevity for its members to pursue its purpose.  *See Boyle*, 556 U.S. at 946.  It also established Third Shift's common purpose of making money from repeated criminal activity.  *See Church*, 955 F.2d at 698.

But that's not all.  Third Shift had its own "rules and rituals," which also showed that it was a racketeering enterprise.  *See Starrett*, 55 F.3d at 1545 (explaining that "rules and rituals may help

prove the existence of a group of individuals associated for a common purpose of engaging in a course of conduct"). Cintron testified that Third Shift was a "gang" that had its own color (black), hand sign ("an A-ok sign"), song, flag ("a black bandanna"), "friendly" gang ("North Side"), and rival gang ("South Side") that Third Shift was "always in altercations with." Rodriguez was a member of Third Shift, Cintron said, and Rodriguez and others "rep[ped] it" by "[t]hrowing up gang signs [and] stuff like that." All of Third Shift's "rituals" were further evidence of an association-in-fact. *See id.*

Second, a reasonable jury could conclude that Rodriguez agreed to participate in Third Shift's pattern of racketeering activities—primarily, selling drugs out of the Third Shift trap house. Rodriguez lived at the trap house, was "in charge" of its operations, and took steps to protect the trap house. He locked the refrigerator (where money was kept); he retained a housekeeper to clean up and "bring out" drug paraphernalia left behind by users; he set up exterior security cameras connected to a video feed inside the house; and he provided guns for Third Shift gang members to use to guard the house. And although "[a] variety of boys" sold drugs out of the trap house, according to Brewer, it was "[m]ostly" Rodriguez. Rodriguez kept drugs in a backpack in his bedroom and sold "[a]nything that you needed"—marijuana, powder cocaine, crack cocaine (cooked by J.R. and packaged by Rodriguez), heroin, and pills—from the house "every day." He sold to his sister Maryha, to Cintron several times a week, to Couch (Rodriguez's brother's friend) "[m]ore than probably like a hundred times," and

to Thompson's girlfriend Dunton.  Evidence of Rodriguez's efforts to oversee the trap house, to lead the drug trafficking business that operated out of it, and to provide other Third Shift members with drugs (for sale) and guns (for protection) was sufficient for a jury to find beyond a reasonable doubt that Rodriguez agreed with Third Shift's purpose to make money by selling controlled substances from the trap house.  *See United States v. Calderon*, 127 F.3d 1314, 1326 (11th Cir. 1997) ("[T]he conclusion that appellants had a common purpose and plan with the other coconspirators may be inferred from a 'development and collocation of circumstances,'" including "repeated presence at the scene of the drug trafficking." (citations omitted)).

There was also sufficient evidence from which a reasonable jury could find that Rodriguez agreed to participate in Third Shift's crimes of violence.  Cintron testified that Rodriguez taught him to wipe his fingerprints off shell casings to avoid getting caught.  And Rodriguez planned and participated in Third Shift's retaliatory drive-by shooting of rival gang member Julio Tellez.  After planning the crime and giving Cintron bullets, Rodriguez drove one of the two cars and "finish[ed] the job" by shooting Tellez while yelling "Fuck South Side."

In short, there was more than enough evidence for a reasonable jury to conclude that Third Shift was a criminal enterprise and that Rodriguez conspired to participate in Third Shift's racketeering activities.  The district court didn't err in denying his motion for a judgment of acquittal as to count one.

20-10373                Opinion of the Court                41

2. *Churchwell*

Churchwell argues that the evidence supporting his conviction on count one was legally insufficient because the government failed to prove that he agreed to participate in a racketeering conspiracy. And, he contends, the government failed to prove two predicate racketeering acts because the government didn't present evidence that Gardner's murder was premeditated.

As to Churchwell's first argument, a reasonable jury could find that he agreed to participate in a racketeering conspiracy. Again, the government can establish a defendant's agreement by showing that he "agreed personally to commit two predicate acts and therefore to participate in a 'single objective' conspiracy." *Starrett*, 55 F.3d at 1544 (citation omitted). That's the case here—the evidence showed that Churchwell agreed to commit at least two of the predicate acts charged in count one of the indictment.

First, count one's list of predicate acts included Churchwell's "possess[ion] with intent to distribute controlled substances." Sufficient evidence supported a jury finding that Churchwell committed this predicate act. Both Cintron and Couch saw Churchwell repeatedly at the trap house, and Churchwell's "repeated presence" at the trap house was "a material and probative factor that the jury [could] consider in reaching its verdict." *See Calderon*, 127 F.3d at 1326; *see also United States v. Hernandez*, 433 F.3d 1328, 1333 (11th Cir. 2005) ("Although mere presence at the scene of a crime is insufficient to support a conspiracy conviction, presence nonetheless is a probative factor which the jury may consider in determining

whether a defendant was a knowing and intentional participant in a criminal scheme." (citation omitted)).

But Churchwell wasn't just a repeat presence at the trap house; he sold crack and heroin there that he purchased from Rodriguez. Proof that Rodriguez sold drugs to Churchwell—and, more importantly, that he permitted Churchwell to sell those drugs out of the trap house—"rebuts [Churchwell's] argument" that he merely possessed drugs with the intent to distribute at the trap house without joining Third Shift's racketeering conspiracy. *See United States v. Dixon*, 901 F.3d 1322, 1337 (11th Cir. 2018) (explaining, in a drug trafficking conspiracy case, that "[t]he evidence of frequent, coordinated drug sales rebuts each defendant's argument that he merely 'decided to sell drugs by himself, for his own account, in front of the same areas where some of the people he knew were also selling'"). As in *Dixon*, a jury could find beyond a reasonable doubt that Churchwell agreed with Rodriguez to possess with intent to distribute controlled substances. *See id.* And because Churchwell sold drugs from the trap house a couple of days one week, Churchwell agreed to possess with intent to distribute controlled substances at least two times. Thus, a reasonable jury could find beyond a reasonable doubt that Churchwell (1) agreed to Third Shift's "overall objective," and (2) agreed to personally commit two predicate acts of possession with intent to distribute controlled substances to participate in a "single objective" conspiracy. *See Starrett*, 55 F.3d at 1544.

Second, count one's list of predicate acts included Churchwell's use of the trap house "to acquire, maintain, manufacture, and distribute controlled substances, maintain firearms, facilitate prostitution, and conduct [e]nterprise meetings." There was sufficient evidence to support a jury finding that Churchwell committed this predicate act too. As we discussed above, the evidence showed that Churchwell bought drugs from Rodriguez for the purpose of selling those drugs out of the trap house. The evidence also showed that Rodriguez supplied guns at the trap house, and that Churchwell carried one of Rodriguez's revolvers there. This was sufficient to support a jury finding that Churchwell "maintained" the trap house. *See United States v. Clavis*, 956 F.2d 1079, 1091 (11th Cir.) (concluding that evidence that defendant distributed drugs from a stash house, coupled with "[h]is possession of a firearm, plus presence of firearms in the house and his discussion of firearms with [a government informer], permitted the jury to infer that he was protecting the stash house and its inventory"), *modified on other grounds on reh'g*, 977 F.3d 538 (11th Cir. 1992).

And third, count one listed as a predicate act Churchwell's conspiracy with Rodriguez to "obstruct the investigation into the murder of Earnestine Gardner by . . . threatening and causing others to threaten witnesses, destroying evidence, and providing false and incomplete information to law enforcement." There was sufficient evidence to support a jury finding that Churchwell committed this predicate act. After Churchwell was arrested for Gardner's murder, Churchwell called Rodriguez several times from jail. Based on the November 2016 conversation, a reasonable jury could

find that Churchwell conspired with Rodriguez to threaten witnesses. Churchwell asked Rodriguez to figure out who was at the trap house on the day of the murder so his "private investigator" could talk to them, "verify" Churchwell wasn't there, and "get everybody . . . [r]ounded up. . . . Boom, boom, boom, you know what I'm saying?" Rodriguez promised to figure out who was at the house. And during the January 2017 conversation, Churchwell asked Rodriguez whether he "got rid of [Churchwell's] three-wheeler, you feel me, that three-wheeler." Rodriguez assured Churchwell that it was "gone." A jury could reasonably infer that Churchwell was asking if Rodriguez got rid of the gun that he used to kill Gardner.

Turning to Churchwell's second argument—that the district court should've granted his motion for judgment of acquittal as to count one because the government didn't present evidence that Gardner's murder was premeditated—it fails for two reasons.

First, even if the district court erred by submitting Gardner's murder to the jury as a possible racketeering predicate, Churchwell invited the error. "The doctrine of invited error is implicated when a party induces or invites the district court into making an error." *United States v. Stone*, 139 F.3d 822, 838 (11th Cir. 1998). And when the doctrine applies, "we are precluded from addressing [the invited] error[]." *Id.* Here, Churchwell conceded to the district court that the government "presented enough evidence to get past a [r]ule 29 [motion]" with respect to Gardner's murder as a racketeering predicate. In other words, he told the district court that

there was sufficient evidence of premeditation. That is invited error and "we are precluded from addressing" it on appeal. *Id.* ("[A] defendant should not benefit from introducing error at trial with the intention of creating grounds for reversal on appeal.").

Second, even taking Gardner's murder out of the equation, the government still proved that Churchwell committed at least two predicate acts. As we discussed above, sufficient evidence established that Churchwell possessed "with intent to distribute controlled substances" on multiple occasions, used the trap house "to acquire, maintain, manufacture, and distribute controlled substances, maintain firearms, facilitate prostitution, and conduct [e]nterprise meetings," and conspired with Rodriguez to obstruct the investigation into Gardner's murder. That, in turn, was enough to infer his agreement. *See Starrett*, 55 F.3d at 1543.

In sum, because a reasonable jury could conclude that Churchwell "agreed personally" to commit (at least) two predicate acts, sufficient evidence established his agreement to participate in Third Shift's racketeering conspiracy. *See id.* at 1544.

### 3. *Thompson*

Thompson argues that his racketeering-conspiracy conviction on count one was legally insufficient for the same reason he raised in his post-verdict renewed motion for judgment of acquittal. Specifically, Thompson cites the Supreme Court's holding in *Davis* that section 924(c)'s residual clause is unconstitutionally vague—plus our holdings in *Brown* and *United States v. Green*, 981 F.3d 945, 950 (11th Cir. 2020), that neither Hobbs Act robbery nor

racketeering conspiracy are section 924(c) crimes of violence—as "preclud[ing] the conviction obtained on [c]ount [one] because the categorical approach must be used when determining whether an offense qualifies under the elements clause."  As he argued in his post-verdict motion, Thompson argues on appeal that his racketeering-conspiracy conviction must be vacated because of "the possibility that the jury's verdict was based on a crime of violence that is unconstitutionally vague under *Davis*."

Thompson's argument is unavailing.  Although he was convicted of section 924(c) offenses in counts fifteen and seventeen, on appeal, he only challenges the sufficiency of the evidence supporting his conviction on count one.  But count one was a section 1962(d) racketeering-conspiracy count—not a section 924(c) firearm count.  There is nothing vague about the racketeering-conspiracy statute, and *Davis*, *Brown*, and *Green* had nothing to do with section 1962(d).  We agree with the district court that Thompson's argument fails.

### Drug conspiracy (count two—Rodriguez and Churchwell)

Rodriguez and Churchwell challenge the sufficiency of their convictions for conspiracy to distribute and to possess with intent to distribute a controlled substance, in violation of sections 846 and 841(b)(1)(C).  Section 841(b)(1)(C) prohibits possessing with the intent to distribute a controlled substance, and section 846 prohibits conspiring to do so.  "To support a conspiracy conviction under [section] 846, the government must prove that there is an agreement by two or more persons to violate the narcotics laws."

*United States v. Parrado*, 911 F.2d 1567, 1570 (11th Cir. 1990).  The elements of a section 846 conspiracy are: "(1) an agreement between the defendant and one or more persons, (2) the object of which is to do either an unlawful act or a lawful act by unlawful means." *United States v. Toler*, 144 F.3d 1423, 1426 (11th Cir. 1998).

### 1. *Rodriguez*

Rodriguez argues that there was insufficient evidence that he agreed with Churchwell or Thompson, or anyone else, to possess and distribute controlled substances.  No one disputes that Rodriguez and other Third Shift members possessed and sold drugs.  Rodriguez doesn't contest that he sold drugs and concedes that Churchwell and Thompson "had their own drug-dealing operation going, with multiple sources of supply, and multiple distribution points."  The narrow question for us is whether a reasonable jury could find that Rodriguez had an agreement with the others to possess and sell drugs.[7]

A reasonable jury could make that finding because the government presented sufficient evidence of an agreement between Rodriguez and other Third Shift members to possess and sell drugs.  Rodriguez, Churchwell, Thompson, and Cintron all regularly sold drugs from the trap house.  Rodriguez also supplied weapons for

---

[7] Rodriguez also raises the same arguments he made to challenge the sufficiency of the evidence supporting his racketeering-conspiracy conviction.  Because we already rejected those arguments in affirming his conviction on count one, we won't address them again here.

Churchwell, Thompson, Cintron, and other Third Shift members to use to defend the trap house, as well as surveillance cameras for additional protection. From the evidence, a reasonable jury could infer an "overlap of participants" (Rodriguez and the other Third Shift members) and that they "had a common goal: to deal in [controlled substances] and to provide a marketplace for [controlled substances]." *See Dixon*, 901 F.3d at 1336 (citation omitted); *id.* at 1337 (observing that "evidence of frequent, coordinated drug sales rebuts" any argument that each defendant was selling by himself, for himself, in the same place as other defendants).

Critically, Rodriguez provided not only a place where his associates could sell drugs—the trap house—but also many of the drugs that other Third Shift members sold. At the trap house, Churchwell sold drugs that he bought from Rodriguez. Thompson likewise obtained from Rodriguez some of the drugs that he sold. And Cintron both sold drugs he'd bought from Rodriguez—with Rodriguez's knowledge and without needing to ask permission— and sold on Rodriguez's behalf a "couple times." The fact that other Third Shift members sold drugs provided to them by Rodriguez is proof that Rodriguez had an agreement with them to possess and distribute drugs. *See Toler*, 144 F.3d at 1426.

2. *Churchwell*

Churchwell argues that there was no evidence of an agreement to distribute controlled substances, no evidence that Churchwell knew of the unlawful purpose of the plan, and no evidence that he willfully joined the plan.

A reasonable jury could find that Churchwell willfully agreed to sell drugs with other Third Shift members. Cintron was at the trap house "[a]lmost every day" and saw Churchwell there several times. Other witnesses confirmed Churchwell's presence at the trap house. Once again, Churchwell's regular presence at Third Shift's trap house is evidence of whether he "was a knowing and intentional participant in [the] criminal scheme." *See Hernandez*, 433 F.3d at 1333 (citation omitted).

And the evidence showed that Churchwell wasn't an innocent bystander merely present at the trap house. Cintron testified that Churchwell "would hang out and try to sell drugs"—crack and heroin—while there. Indeed, Churchwell murdered Gardner at the trap house after she complained about being shorted change when Churchwell sold her cocaine. The jury also saw evidence that Churchwell arranged sales of heroin and molly through text messaging, and they heard testimony that multiple baggies containing heroin were confiscated from him during his September 2016 arrest. And although Churchwell sometimes brought his own drugs to the trap house to sell, other times he'd buy the drugs he sold from Rodriguez. The fact that Churchwell routinely sold drugs provided to him by Rodriguez at Rodriguez's trap house allowed the reasonable inference that he had willfully entered into an agreement with Rodriguez to possess and sell drugs. *See Dixon*, 901 F.3d at 1336–37.

<u>Violent crimes in aid of racketeering</u>
<u>(counts three and four—Rodriguez)</u>

The jury found that Rodriguez committed two violent crimes in aid of racketeering under section 1959(a): conspiring to murder rival gang members (count three), and actually murdering Tellez (count four). Rodriguez argues there was insufficient evidence to convict on either count, contending that the government didn't prove (1) that he knowingly conspired to murder rival gang members to maintain and increase his position in a racketeering enterprise, and (2) that Tellez was a rival gang member. But we conclude that a reasonable jury could find that Rodriguez conspired to murder, and actually murdered, in aid of racketeering.[8]

Section 1959(a) provides that "[w]hoever . . . for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders . . . any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished . . . by death or life imprisonment." 18 U.S.C. § 1959(a)(1). "A person commits a violent crime in aid of racketeering" under section 1959(a) "when he commits," or conspires to commit, "a particular kind of violent crime—such as 'murder'—'for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity.'" *Alvarado-Linares v. United States*, 44 F.4th

---

[8] In addition, Rodriguez repeats the same arguments challenging his count-one conviction for a racketeering conspiracy that we have already rejected.

1334, 1339 (11th Cir. 2022) (quoting 18 U.S.C. § 1959(a)); *see also United States v. McClaren*, 13 F.4th 386, 403 (5th Cir. 2021) (the government must prove that (1) "a criminal organization exist[ed]," (2) the "organization [wa]s a racketeering enterprise," and (3) "the defendant committed a violent crime" (4) "for the purpose of promoting his position in [the] racketeering enterprise" (citation omitted)).

Sufficient evidence showed Rodriguez knowingly conspired to murder rival gang members—specifically, the South Side gang members at Tellez's house. After Cintron and Uscanga chased the South Side members back to Tellez's house from the corner store, Cintron retrieved a gun, then drove to the trap house, told Rodriguez and Macho about the corner store fight, and got ammunition from Rodriguez. At the trap house, Rodriguez helped plan the fatal attack: Cintron, Rodriguez, and other Third Shift members decided to use two cars, with Cintron in the first car acting as a lure to "bring [the South Side gang members] out" and Rodriguez in the second car to "finish the job" ("mean[ing] whoever came out[ of Tellez's house, Rodriguez] was going to start shooting at"). He then helped carry out the plan, knowing that the goal was to kill South Side members—when the men attacked Tellez, Santoyo, and Montoya, Rodriguez shouted "Fuck South Side." And Rodriguez doesn't dispute that he actually murdered Tellez during the attack.

Sufficient evidence also showed that Rodriguez's motive for conspiring to murder South Side members and murdering Tellez was to "maintain[] or increas[e his] position in" Third Shift. *See*

*Alvarado-Linares*, 44 F.4th at 1339 (quoting 18 U.S.C. § 1959(a)). "The government can establish the motive element" in section 1959(a) "with evidence that the defendant committed the violent crime because he knew it was expected of him by reason of his membership in the gang or that he committed the violent crime in furtherance of that membership." *Dixon*, 901 F.3d at 1342–43 (cleaned up). "[E]vidence that 'violence was a part of the group's culture,' 'that the group expected its members to . . . engag[e] in violent acts,' or that the defendant reported his actions to prove himself or 'to brag' supports the inference that the defendant 'was motivated' by his membership." *Id.* at 1343 (citations omitted). "What matters is whether the [evidence] supports the inference that [the defendant], at the time of the murder[], was motivated to kill others in order to bolster his credibility as a member of the group." *United States v. Robertson*, 736 F.3d 1317, 1331 (11th Cir. 2013).

Here, Rodriguez bragged to Cintron that he said "Fuck South Side" as he shot Tellez. And eight days after the murder, Rodriguez posted on social media that

> I play this game well I feel like its monopoly, except I'm grinding hard I don't see nothing stopping me, tossin out that money like I'm some kind of slot machine, *keep ya eyes to yaself before u hear that choppa scream, 100 round drum and its fully loaded, take me as a joke but ima shoot it if I tote it.*

A few days later, Rodriguez updated his status: "It's time to leave state cause [n-words] is gna make me go Rambo dog g shit." Then,

after a friend told Rodriguez that someone had "snitched" on him, Rodriguez replied that he hated people "who act gangsta but they wna talk to police when gangsta shit goes down." This reply followed a status update earlier the same day challenging people who "think they hard but wna talk to the police and snitch": "I stay on 11th street come my way with that p**** shit dog I know real crips that'll check yaw ass." And that wasn't the only time Rodriguez publicly challenged a snitch; he also posted a status update declaring: "Facebook gangster right here [n-word] my adress is 5832 11th street east came fade"—meaning "come fight"—"if u want it [n-word] aint nobody scared [n-word] but believe me if u pull a gun im killing yo ass [n-word], fuck talking run up."

Rodriguez's boast to Cintron that he yelled "Fuck South Side" during the attack, his social media posts bragging shortly after the attack—that he was "play[ing] th[e] game," ready to "shoot" his "choppa," and about to "go Rambo dog g shit"—and his exasperation with people who only wanted to "act gangsta" allowed a reasonable jury to find that Rodriguez's motive was to bolster his standing or credibility with Third Shift. *See Dixon*, 901 F.3d at 1342–43; *Robertson*, 736 F.3d at 1331.

Rodriguez argues that the evidence was insufficient because the government didn't prove Tellez was actually a rival gang member. But this argument fails—the government didn't have to prove Tellez was a rival gang member to show Rodriguez violated section 1959(a).    Section 1959(a) prohibits "murder[ing]," or

"conspir[ing]" to murder, *"any individual"* to promote one's position in a racketeering enterprise.  18 U.S.C. § 1959(a) (emphasis added).  There was sufficient evidence here that Rodriguez conspired to murder South Side members and actually murdered Tellez—all to promote his position in Third Shift.

### Use of a firearm during and in relation to a
### crime of violence (count five—Rodriguez)

On count five, the jury found that Rodriguez violated section 924(c)(1)(A) by using a firearm during and in relation to a crime of violence—the murder of Tellez as charged in count four. Rodriguez repeats the same argument he made for the other counts—that no reasonable jury could find he acted for the purpose of maintaining or increasing his position in an enterprise.  That argument fails for the same reasons we've already discussed.

### Use of a firearm during and in relation to drug trafficking crimes
### and a crime of violence (count ten—Churchwell)

Count ten alleged that Churchwell violated section 924(c)(1)(A) by using a firearm during and in relation to the drug trafficking conspiracy alleged in count two, maintaining a drug distribution house as alleged in count twenty, and murdering Gardner in aid of racketeering as alleged in count nine.  The jury declined to find that Churchwell used a firearm to murder Gardner in aid of racketeering.  But it still found him guilty on count ten, finding that he used a firearm during and in relation to the drug trafficking conspiracy and maintaining the trap house—and that he caused Gardner's death in the process.  Churchwell argues that

there was insufficient evidence that he committed either of the two predicate crimes. And he contends there was no evidence he used a firearm during and in relation to those crimes.

As we explained above, the evidence was sufficient to convict Churchwell of conspiring to possess and sell drugs. And, as we explain later as to count twenty, the evidence was also sufficient to convict Churchwell of maintaining a drug distribution house. Thus, the only remaining question is whether a reasonable jury could find that Churchwell used a firearm during and in relation to the drug crimes alleged in counts two and twenty.

There was. Rodriguez always kept weapons in the trap house for other Third Shift members, like Churchwell, to "pick up" and "hold" to "protect [the] house." The housekeeper, Brewer, testified that "whoever was in the[ trap house] usually had [Rodriguez's] guns on them," and witnesses saw Churchwell armed with Rodriguez's revolver the morning that he murdered Gardner at the trap house.

The "in relation to" element requires that the firearm "at least . . . facilitate, or have the potential of facilitating, the drug trafficking offense." *Smith v. United States*, 508 U.S. 223, 237–38 (1993) (cleaned up) (explaining that "in relation to" is "expansive"). Here, a reasonable jury could find that Churchwell's use of a firearm at least "facilitate[d]" or had "the potential of facilitating" the drug crimes. *Id.* Again, Rodriguez provided Third Shift members like Churchwell with guns to "protect [the] house," and Cintron saw

Churchwell selling crack and heroin there. *Cf. United States v. Novaton*, 271 F.3d 968, 1013 (11th Cir. 2001) (reasoning that defendant's use of weapon to protect drug distribution duplex was "in relation to" drug trafficking); *United States v. Young*, 131 F.3d 1437, 1439 (11th Cir. 1997) (reasoning that loaded guns' "close proximity to the drugs" supported a "relation to" drug trafficking). And just before Churchwell shot Gardner, he told Brewer he'd been arguing with Gardner about a drug sale. This evidence supports that Churchwell's use of the gun at a drug distribution house was not merely "the result of accident or coincidence." *Smith*, 508 U.S. at 238.

### Accessory after the fact (count twelve—Rodriguez)

On count twelve, the jury found that Rodriguez was an accessory after the fact to Churchwell's (1) use of a firearm in furtherance of drug trafficking crimes and a crime of violence (count ten) and (2) possession of ammunition by a felon (count eleven).[9] Rodriguez argues that there was no evidence he knew that Churchwell committed these offenses. Rodriguez also argues there was insufficient evidence that he "assisted Churchwell in order to hinder or prevent [his] apprehension." He contends that he "did not assist Churchwell in fleeing" and emphasizes that Churchwell was already in jail during the recorded calls.

---

[9] Count twelve also charged Rodriguez with being an accessory to Gardner's murder in aid of racketeering (count nine), but the jury found that the government didn't prove this predicate.

The accessory statute provides that "[w]hoever, knowing that an offense against the United States has been committed, receives, relieves, comforts[,] or assists the offender in order to hinder or prevent his apprehension, trial[,] or punishment, is an accessory after the fact." 18 U.S.C. § 3. To establish a section 3 violation, the government had to prove that Rodriguez knew that Churchwell committed a federal offense and, "with such knowledge[,] . . . rendered assistance in order to hinder or prevent [Churchwell's] apprehension, trial[,] or punishment." *See United States v. Norton*, 464 F.2d 85, 86 (5th Cir. 1972).

A reasonable jury could find Rodriguez knowingly assisted Churchwell's use of a firearm in furtherance of drug trafficking crimes and a crime of violence (count ten). On the first element—knowledge—there was evidence that Rodriguez knew about Churchwell's illegal use of a firearm in furtherance of the drug trafficking crimes. Churchwell was repeatedly at the trap house and sold drugs there; indeed, Churchwell got some of the drugs he sold from Rodriguez. And Rodriguez kept guns at the trap house for Third Shift members—like Churchwell—to handle and carry to protect the house. Earlier in the morning of the day that he murdered Gardner, Churchwell had Rodriguez's revolver.

Rodriguez also knew Churchwell used a firearm to kill Gardner over a drug-related dispute at the trap house. Rodriguez was initially asleep when Gardner arrived, but Brewer sent someone to wake him up to "diffuse[]" the situation. Rodriguez then went outside in front of the trap house. And while Rodriguez was standing

outside, Churchwell shot Gardner as she walked outside the trap house through the front door.

As for the second element, there was sufficient evidence Rodriguez "rendered assistance in order to hinder or prevent [Churchwell's] apprehension, trial[,] or punishment" for Churchwell's drug crimes and murder. *See Norton*, 464 F.2d at 86. After Churchwell murdered Gardner, Rodriguez lied to investigators that he'd awakened to the sound of gunshots outside his house but didn't know who the victim was and hadn't seen the shooter. Then, when the police later interviewed Rodriguez about the murder, Rodriguez lied that he didn't know Churchwell—even though he and Churchwell had exchanged nineteen calls and several texts on the day of Gardner's murder. A reasonable jury could conclude that Rodriguez told these lies to assist Churchwell and hinder or prevent his apprehension. *See id.* at 85–86 (affirming defendant's conviction as accessory after the fact to bank robbery where the defendant "lied to FBI agents as to the whereabouts of the robbers").

Also, following Churchwell's arrest, Rodriguez assured Churchwell that his security-camera DVR "ain't have nothing" on it and promised he'd figure out who was at the trap house the day of Gardner's murder so that Churchwell's private investigator could "verify" that Churchwell wasn't there, "plain and simple." When Churchwell praised Rodriguez for "show[ing] up for real"— telling Rodriguez that Churchwell was "ride or die about [him] now"—Rodriguez explained his motive for helping Churchwell. Rodriguez said "[he] be wanting [Churchwell] to get the fuck up

outta there."  Indeed, in a later call, Rodriguez assured Churchwell that he had taken care of the "three-wheeler"—which, as we've already explained, a reasonable jury could infer meant the gun Churchwell had used to kill Gardner.  Rodriguez's promise to track down witnesses to provide false testimony about Churchwell's whereabouts, Rodriguez's statement that he "be wanting" to get Churchwell "the fuck up outta there," and evidence that Rodriguez disposed of the murder weapon, was sufficient evidence that he tried to hinder or prevent Churchwell's trial or punishment.  *See United States v. Bell*, 819 F.3d 310, 323 (7th Cir. 2016) (affirming conviction as accessory after the fact to murder where the defendant tried to dispose of the murder weapon and "made inconsistent and demonstrably false statements to investigators").

A reasonable jury could separately find Rodriguez was an accessory after the fact to Churchwell's possession of ammunition as a felon (count eleven).  There was evidence that Rodriguez knew about Churchwell's prohibited status.  After Churchwell's arrest, Rodriguez said, in a recorded jail call, that law enforcement suspected Churchwell of Gardner's murder because Churchwell "already got a previous charge."  Rodriguez also knew Churchwell possessed ammunition—again, Rodriguez kept guns at the house for Third Shift members to protect the trap house and he was at the house when Churchwell shot Gardner.  And there was evidence that Rodriguez taught Third Shift members how to wipe bullets clean of their prints before loading them.

Rodriguez argues that he wasn't an accessory after the fact to either of Churchwell's crimes because Churchwell was already apprehended when the jail calls were made. This argument fails for two reasons.

First, Rodriguez falsely told the police *prior* to Churchwell's arrest that he didn't see who shot Gardner. These statements—made before Churchwell's apprehension—were made to hinder or prevent apprehension.

Second, Rodriguez's reading of the accessory after the fact statute is too cramped. Section 3 doesn't just prohibit assisting an offender to hinder or prevent an apprehension; it also prohibits assisting an offender to hinder or prevent "trial or punishment." 18 U.S.C. § 3. In helping Churchwell locate witnesses who could provide false testimony about his whereabouts and disposing of the murder weapon, Rodriguez assisted Churchwell and hindered his trial and punishment. Because this assistance made Rodriguez an accessory after the fact to Churchwell's crimes, we affirm his conviction in count twelve.

Accessory after the fact (count nineteen—Rodriguez)

On count nineteen, the jury found that Rodriguez was an accessory after the fact to Thompson's murders of Joseph and Stevenson-Weeks in aid of racketeering (charged in counts fourteen and sixteen). Rodriguez argues that no reasonable juror could have found that he knew that Thompson had committed murder in aid

of racketeering.[10] We conclude that the evidence was legally sufficient.

Rodriguez doesn't contest that Thompson murdered Joseph and Stevenson-Weeks, that the murders were in furtherance of racketeering, or that he aided Thompson to avoid his apprehension for these murders. He only challenges his knowledge of Thompson's crime. But for two reasons, a reasonable jury could find beyond a reasonable doubt that, in assisting Thompson, Rodriguez knew both that Thompson had murdered Joseph and Stevenson-Weeks and that he'd done so in aid of racketeering.

First, sufficient evidence established that Rodriguez knew Thompson had committed the murders when he helped Thompson conceal the crime. Thompson and Rodriguez spoke by phone eight times (and a ninth by text) that day, beginning within an hour of the murders. Rodriguez also drove Thompson back to Thompson's house shortly after the murders.

Also, Thompson told Stackhouse (another neighborhood drug dealer) that Dunton's car's window was pierced by a bullet during the shooting, so he "took it to a shop to get the window fixed." Indeed, street camera footage taken a few minutes after the

---

[10] Rodriguez also argues that no reasonable jury could have convicted him of aiding Thompson's use of a firearm in furtherance of a drug trafficking crime and a crime of violence, or his possession of a firearm in violation of a domestic violence restraining order. But the jury specifically found that Rodriguez was guilty in count nineteen only for aiding Thompson's murders of Joseph and Stevenson-Weeks.

murders showed a bullet hole in the Pontiac's windshield that wasn't there before the shootings. Thompson testified that Rodriguez told him where to get the windshield repaired. A few days after the murders, when the windshield was fixed, Rodriguez called and texted Thompson and Dunton to let them know the car was ready to be picked up. A reasonable jury could conclude from this evidence that Rodriguez knew about the bullet hole (and therefore the murders) and played a role in repairing the bullet hole to help Thompson avoid arrest for the murders.

Second, a reasonable jury could conclude beyond a reasonable doubt that Rodriguez knew Thompson had committed the murders *in aid of racketeering*. Rodriguez knew that Thompson—Rodriguez's childhood "best friend[]" and "little do-boy," who Rodriguez "took care of . . . a lot"—was part of Third Shift's conspiracy to sell drugs and commit violent crimes. As a member of Third Shift, Thompson would "throw up the gang sign" and wear Third Shift's black bandanna "flag." Thompson was at the trap house about once a week, and he handled Rodriguez's assault weapons while there.

Rodriguez's knowledge of Thompson's involvement in Third Shift is key. In addition to selling drugs, murdering people to protect the trap house, and murdering rival gang members, Third Shift's criminal activity included theft. Cintron testified that Third Shift members "regularly committed thefts"—including the robbery of a TV, cash, and a pistol, after which Rodriguez "threatened to slap the shit out of" Cintron's sister for calling the police.

Both Maryha—Rodriguez's sister and Thompson's ex-girlfriend—and Dunton recalled Thompson bragging about committing robberies. And a police officer testified to seeing Thompson steal a bike.

Because Rodriguez knew that Thompson was a member of Third Shift, and that Third Shift members committed robberies as part of their criminal activities, a jury could reasonably infer that Rodriguez knew that Thompson had murdered Joseph and Stevenson-Weeks to steal Joseph's drugs—in other words, in furtherance of the racketeering enterprise. Thompson told Stackhouse that he went to see Joseph to rob him and came away from the murders with "dope and money." The government elicited evidence that Joseph kept his drugs in a small black shaving kit. And when Thompson returned home from murdering Joseph and Stevenson-Weeks, he was carrying a dark-colored "men's toiletry bag or razor bag" that contained powder cocaine, meth, and small baggies. A reasonable jury could infer that Rodriguez knew about the drugs Thompson stole from Joseph because of their friendship, because of Rodriguez's knowledge of other robberies committed by Third Shift members, because of their multiple conversations after the murder, and—mostly importantly—because Thompson would've had Joseph's toiletry bag, containing Joseph's drugs, in his possession when Rodriguez drove him home after the murders.

In sum, a reasonable jury could infer that Rodriguez knew that Thompson had murdered Joseph and Stevenson-Weeks in aid of Third Shift's drug distribution, theft, and violent-crime activities.

Because sufficient evidence established that Rodriguez was an accessory after the fact to Thompson's murder of Joseph and Stevenson-Weeks in aid of racketeering, we have no basis to disturb his conviction in count nineteen.

### Maintaining a drug distribution house (count twenty—Rodriguez and Churchwell)

On the final count—count twenty—the jury found that Rodriguez and Churchwell aided and abetted the use and maintenance of a place for the purpose of manufacturing and distributing controlled substances, in violation of 18 U.S.C. section 2 and 21 U.S.C. sections 856(a)(1) and 856(b). Section 856(a)(1) makes it unlawful to "knowingly open, lease, rent, use, or maintain any place, whether permanently or temporarily, for the purpose of manufacturing, distributing, or using any controlled substance." 21 U.S.C. § 856(a)(1).

A section 856(a)(1) prosecution requires the government to prove "that the defendant (1) knowingly, (2) operated or maintained a place, (3) for the purpose of manufacturing, distributing, or using any controlled substance." *Clavis*, 956 F.2d at 1090. "Acts evidencing such matters as control, duration, acquisition of the site, renting or furnishing the site, repairing the site, supervising, protecting, supplying food to those at the site, and continuity are . . . evidence of knowingly maintaining the place[,] considered alone or in combination with evidence of distributing [controlled substances] from that place." *Id.* at 1091.

1. *Rodriguez*

Rodriguez argues that the trap house was maintained by another drug dealer—J.R.—and by Brewer at the direction of J.R., rather than by him.  He contends that the government's theory that he maintained the trap house "for J.R." was outside the scope of the indictment.  We disagree.

Rodriguez lived at the trap house and paid rent and utilities there.  Brewer testified that J.R. "put[] his man" Rodriguez "in charge" of the trap house and instructed her to "deal with [Rodriguez] and help him make some money."  And Rodriguez took steps to protect the trap house—and the drugs and money it contained—by locking the refrigerator, bringing Brewer in to clean up after the drug users, setting up security cameras, and supplying numerous firearms for Third Shift members to use.  We have no difficulty concluding that paying rent and utilities at the house, "supervising" its operations, and "protecting" the trap house by installing locks and cameras, retaining a housekeeper, and providing weaponry to other gang members constitute "maintaining" the trap house under section 856(a)(1).  *See id.*

Moreover, we consider evidence that the defendant knowingly maintained the premises "in combination with evidence of distributing [controlled substances] from that place."  *Id.*  There was ample evidence that Rodriguez distributed drugs from the trap house.  Rodriguez kept drugs in a backpack in his bedroom, and he sold "[a]nything that you needed"—crack and powder cocaine, marijuana, heroin, pills—from the trap house "every day."  According

to Brewer, it was "[m]ostly" Rodriguez who sold the drugs from the trap house.  Cintron bought from him a few times a week, Maryha, Dunton, and Brandi Simon bought from him too, and Couch estimated that he'd bought marijuana from Rodriguez at the trap house "[m]ore than probably like a hundred times."

In short, a reasonable jury could conclude that Rodriguez knowingly maintained the trap house for purposes of drug distribution.  Even if another drug dealer (J.R.) initially placed Rodriguez in charge of the trap house, Rodriguez nevertheless maintained it by paying rent and utilities, supervising it, defending it, and selling drugs out of it.  *See id.*

2. *Churchwell*

Churchwell argues that there was insufficient evidence that he aided and abetted the maintenance of the trap house.

To prove that Churchwell aided and abetted maintenance of the trap house, the government had to show that he:  (1) took "an affirmative act in furtherance of th[e] offense," and (2) did so "with the intent of facilitating the offense's commission."  *United States v. Coats*, 8 F.4th 1228, 1248 (11th Cir. 2021) (citation omitted).  That standard is satisfied here.  Churchwell wasn't a casual visitor to Rodriguez's house; he was a knowing participant in maintaining Third Shift's trap house.

The evidence showed that Churchwell "would hang out and try to sell" crack and heroin at the trap house.  His sale of drugs to Gardner at the trap house set in motion the events that led to her death.  Thus, Churchwell was well aware that the purpose of the

trap house was drug distribution and he participated in that distribution.

And Churchwell aided the maintenance of the trap house. Rodriguez stored weapons in the trap house and allowed other Third Shift members, like Churchwell, to "pick up" and "hold" the guns to "protect [the] house." Brewer testified that Third Shift members at the trap house "usually" had guns on them, and Churchwell's murder of Gardner confirmed that Churchwell was armed when he sold drugs at the trap house. Because Churchwell sold drugs at the trap house and handled guns provided by Rodriguez for the protection of the trap house, a reasonable jury could conclude that Churchwell aided and abetted the maintenance of the trap house for purposes of selling controlled substances. *See id.*

⋆　　⋆　　⋆

In sum, sufficient evidence supported Rodriguez's, Churchwell's, and Thompson's convictions. We turn now to their arguments challenging various other trial matters.

*Deputy Taylor's testimony about Thompson*

Thompson argues that Deputy Taylor improperly commented on his Fifth Amendment right to silence by testifying that Thompson "didn't want to talk to" the police. When Thompson raised a rule 403 objection before the government called Deputy Taylor, the district court ruled that it would "take [the issue] on the fly." Then, when Thompson objected on rule 403 grounds again during Deputy Taylor's testimony, the district court overruled

Thompson's objection "for now."  But Thompson never raised a Fifth Amendment objection at any point before or during trial. And he didn't argue, in asserting his rule 403 objections, that Deputy Taylor's anticipated response would comment on his right to silence.

A defendant must "clearly state the grounds for an objection in the district court." *United States v. Zinn*, 321 F.3d 1084, 1087 (11th Cir. 2003).  The objection must be "sufficient to apprise the trial court and the opposing party of the particular grounds upon which appellate relief will later be sought." *United States v. Straub*, 508 F.3d 1003, 1011 (11th Cir. 2007) (citation omitted).  And so, "[t]o preserve an issue for appeal, a general objection or an objection on other grounds will not suffice." *United States v. Gallo-Chamorro*, 48 F.3d 502, 507 (11th Cir. 1995) (citation omitted).  Thompson, at best, preserved a rule 403 objection at trial but now seeks to bring a constitutional claim on appeal.  Because raising one objection does not preserve a completely separate objection for appeal, *see id.*, we review Thompson's unpreserved Fifth Amendment objection for plain error.  That means Thompson must show that the district court made an error, that the error was plain, and that it affected his substantial rights.  *United States v. Rodriguez*, 398 F.3d 1291, 1298 (11th Cir. 2005).

Thompson failed to establish error, let alone plain error, because he failed to establish that his silence occurred in a custodial setting.  We have said that "a defendant's silence in response to a question in a non-custodial interview by a law-enforcement officer

[i]s admissible as substantive evidence of his guilt" where "the defendant did not 'expressly invoke the privilege against self-incrimination in response to the officer's question.'" *United States v. Wilchcombe*, 838 F.3d 1179, 1191 (11th Cir. 2016) (quoting *Salinas v. Texas*, 570 U.S. 178, 181 (2013)).  We've also said that "[t]he government may comment on a defendant's silence if it occurred prior to the time that he is arrested and given his *Miranda* warnings."  *United States v. Rivera*, 944 F.2d 1563, 1568 (11th Cir. 1991).

Here, there was no indication from Deputy Taylor's testimony that Thompson's refusal to talk was in response to a question during a custodial interview or after his arrest.  Rather, Deputy Taylor testified that he didn't arrest Thompson "for any of []his behavior."  Because the record establishes that Thompson wasn't subjected to a custodial interview when he refused to talk to Deputy Taylor, the district court didn't plainly err in allowing the government to elicit this testimony.  *See id.*; *Wilchcombe*, 838 F.3d at 1191.

### *The jury instruction for count twenty—maintaining a drug distribution house*

Churchwell argues that the district court plainly erred by failing to instruct the jury on the elements of count twenty, maintaining a drug distribution house.  This error violated his due process right to have the jury instructed on the elements, Churchwell argues, and wasn't cured by the instruction in count one, which provided the elements of maintaining a drug distribution house as a predicate act for the racketeering-conspiracy charge.  Because

Churchwell didn't raise this argument before the district court, we also review it for plain error.

"When we apply the plain error rule to jury instructions, we . . . consider the totality of the charge as a whole and determine whether the potential harm caused by the jury charge has been neutralized by the other instructions given at the trial such that reasonable jurors would not have been misled by the error." *United States v. Iriele*, 977 F.3d 1155, 1178 (11th Cir. 2020) (cleaned up). "Jury instructions will not be reversed for plain error unless the charge, considered as a whole, is so clearly erroneous as to result in a likelihood of a grave miscarriage of justice." *United States v. Pepe*, 747 F.2d 632, 675 (11th Cir. 1984) (citation and quotation marks omitted). "If another instruction the court gave neutralized the error, then it was not an error at all, let alone a reversible plain error," "because the charge as a whole d[id] not misinform the jury or prejudice the defendant." *Iriele*, 977 F.3d at 1178 & n.12 (citation omitted).

We conclude that the district court didn't err in instructing the jury on the elements of maintaining a drug distribution house. In the racketeering-conspiracy instruction, the district court listed the maintenance offense as a predicate racketeering act and provided the offense's elements. Then, before "address[ing] the counts of the superseding indictment that charge[d] crimes other than racketeering conspiracy," the district court informed the jury that "[s]ome of these crimes [we]re also charged as racketeering

acts, which [the district court] explained above." Finally, in the separate instruction for count twenty, the district court told the jury to refer back to its predicate-act instruction to determine whether Churchwell was guilty of maintaining a drug distribution house.

The district court's approach to the jury instructions—referring back to other instructions to avoid duplication, and twice explicitly signaling to the jury (once generally before starting the non-racketeering-conspiracy instructions, and again during the count-twenty instruction) that some charged crimes had been "explained above" or "previously instructed"—was not "so clearly erroneous as to result in a likelihood of a grave miscarriage of justice." *See Pepe*, 747 F.2d at 675. Nothing in the law required the district court to repeat itself. To the contrary, "district courts have wide discretion in the phrasing of instructions." *United States v. Akwuba*, 7 F.4th 1299, 1312 (11th Cir. 2021). And the district court told the jury to "follow all of [its] instructions as a whole." [*Id.* at 2] "[W]e presume that the jury followed its instructions." *See United States v. Stone*, 9 F.3d 934, 940 (11th Cir. 1993). Because the district court's instructions for counts one and twenty, taken together, accurately instructed the jury on the elements of maintaining a drug distribution house, we conclude that there "was not an error at all, let alone a reversible plain error." *Iriele*, 977 F.3d at 1178.

*The justifiable use of deadly force jury instruction*

The racketeering charges against Rodriguez in counts one, three, and four alleged that he conspired to murder, and did in fact

murder, Tellez, in violation of Florida Statutes section 782.04.  Rodriguez contends that the district court abused its discretion in failing to instruct the jury on the justifiable use of deadly force, his affirmative defense to Tellez's murder.  He argues his proposed instruction was correct and Florida's self-defense law didn't require that a "duty to retreat instruction be given" where "there was no duty on the part of Rodriguez to retreat from his own car or from a public street."

"A criminal defendant has the right to a jury instruction on a proposed theory of defense, provided it is a valid defense and there is some evidence at trial to support the instruction." *United States v. Lanzon*, 639 F.3d 1293, 1302 (11th Cir. 2011) (citation omitted).  "We consider three factors when determining whether the district court's refusal to give a requested jury instruction warrants reversal:  '(1) whether the requested instruction is a substantially correct statement of the law; (2) whether the jury charge given addressed the requested instruction; and (3) whether the failure to give the requested instruction seriously impaired the defendant's ability to present an effective defense.'" *United States v. Hill*, 799 F.3d 1318, 1320 (11th Cir. 2015) (citation omitted).  We conclude that Rodriguez's proposed instruction was not a substantially correct statement of Florida law.

Under Florida common law, "a person [could] not resort to deadly force without first using every reasonable means within his or her power to avoid the danger, including retreat," even if the person "reasonably believe[d] that deadly force [wa]s necessary"

for self-defense. *Weiand v. State*, 732 So. 2d 1044, 1049 (Fla. 1999) (citations omitted). But the Florida Legislature modified the common law rule by enacting Florida Statutes section 776.012(2). Section 776.012(2) codifies justifiable use of deadly force as an affirmative defense to murder. Fla. Stat. § 776.012(2) ("A person is justified in using or threatening to use deadly force if he or she reasonably believes that using or threatening to use such force is necessary to prevent imminent death or great bodily harm to himself or herself or another or to prevent the imminent commission of a forcible felony."). And it "suspends the common[ ]law duty to retreat . . . in limited, defined circumstances." *State v. Wagner*, 353 So. 3d 94, 101 (Fla. Dist. Ct. App. 2022).

Specifically, under section 776.012(2), a person who "us[es] or threaten[s] to use . . . deadly force" in reasonable self-defense has no duty to retreat "if the person . . . is not engaged in a criminal activity and is in a place where he or she has a right to be." Fla. Stat. § 776.012(2). But if the person who uses, or threatens to use, deadly force is engaged in criminal activity when attacked, the common law duty to retreat still applies. *See State v. Kirkland*, 276 So. 3d 994, 997 (Fla. Dist. Ct. App. 2019) (holding that trial court erred in dismissing defendant's charge for shooting at a building because, although "he was in a place he had a right to be," the defendant "was engaged in [uncharged] illegal activity," specifically "open carry of a firearm," Fla. Stat. § 790.053(1), "improper exhibition of a firearm," *id.* § 790.10, and "aggravated assault with a firearm," *id.* § 784.021(1)(a)).

Consistent with section 776.012(2), the standard Florida jury instruction governing the justifiable use of deadly force provides that a trial court should "[g]ive the paragraph below when there is evidence that the defendant was engaged in criminal activity":

> If (defendant) was otherwise engaged in criminal activity or was not in a place he had a right to be, then the use of deadly force was not justified unless he used every reasonable means within his power and consistent with his own safety to avoid the danger before resorting to the use of deadly force. The fact that the defendant was wrongfully attacked cannot justify his use of deadly force, if, by retreating, he could have avoided the need to use deadly force. However, if (defendant) was placed in a position of imminent danger of death or great bodily harm and it would have increased his own danger to retreat, then his use of deadly force was justifiable.

Fla. Standard Instr. (Crim.) 3.6(f) (cleaned up) (citing *Morgan v. State*, 127 So. 3d 708 (Fla. Dist. Ct. App. 2013)); *see also Morgan*, 127 So. 3d at 716 ("[T]he 'no duty to retreat' rule," as originally codified in Florida Statutes section 776.013(3), "applies only when a person 'is not engaged in an unlawful activity.'" (citation omitted)).

Here, there was evidence that Rodriguez was "engaged in" multiple "criminal activit[ies]" when he sprayed Tellez's house with bullets during a retaliatory drive-by shooting. Fla. Stat. § 776.012(2). Rodriguez, along with other Third Shift members, devised an elaborate plan to kill South Side gang members. *Cf. id.*

§ 777.04(3) ("A person who agrees . . . [or] combines . . . with another person . . . to commit any offense commits the offense of criminal conspiracy . . . ."). Rodriguez doesn't dispute that he "discharge[d] a firearm . . on . . . a[] paved public road"—a crime under Florida law—when executing that plan. *Id.* § 790.15(1). [**Rodriguez Br. at 51–52**] There was also evidence that Rodriguez was "shoot[ing] at" persons from a car and toward a "private building" (Tellez's house)—separate crimes under Florida law. *Id.* § 790.19; *see also id.* § 790.10 (exhibiting a firearm "in the presence of one or more persons . . . in a . . . threatening manner" is a crime); *id.* § 790.15(2) (firing a gun while an "occupant of any vehicle" and "within 1,000 feet of any person" is a crime); *id.* § 790.07(1) (using or attempting to use "any weapon" "while committing or attempting to commit any felony" is itself a felony); *cf. Kirkland*, 276 So. 3d at 997 (reasoning that similar firearms offenses qualified as "criminal activity").

If the jury found that Rodriguez was engaged in criminal activity, then section 776.012(2)'s limited suspension of the common law duty-to-retreat rule could not apply even if Rodriguez had a right to be on the public road. *See Kirkland*, 276 So. 3d at 997; *Morgan*, 127 So. 3d at 716. That would mean Rodriguez's use of deadly force was justified only if he "first us[ed] every reasonable means within his . . . power to avoid the danger, including retreat," *even if* he "reasonably believe[d] that deadly force [wa]s necessary" for his self-defense. *Weiand*, 732 So. 2d at 1049; *see also* Fla. Standard Instr. (Crim.) 3.6(f). But Rodriguez's proposed self-defense instruction didn't tell the jury to consider whether he was engaged in criminal

activity, so it would've allowed the jury to find justification without considering whether he could have first retreated.

That omission made Rodriguez's proposed instruction "incomplete" and "misleading." *See United States v. Silverman*, 745 F.2d 1386, 1396 (11th Cir. 1984) (explaining that a district court "is bound to refuse a requested instruction that is incomplete, erroneous, or misleading"). And, because his proposed instruction was misleading and incomplete, the district court didn't abuse its discretion in refusing to give Rodriguez's self-defense instruction unless it also told the jury to consider whether Rodriguez was engaged in criminal activity (an offer Rodriguez rejected).

*The jury's question about the racketeering charge*

Rodriguez argues that the district court erred in answering the jury's question about whether it could find a defendant guilty of murder if he were found not guilty of racketeering. Rodriguez argues that the district court should have instructed the jury consistent with the government's position: that the jury could have found the section 1111 murder enhancement to the section 924(c) charge without "determin[ing] that the perpetrator was also a part of a racketeering organization." We conclude that Rodriguez invited any error.

Again, "[w]here a party invites error," we are "precluded from reviewing that error on appeal." *United States v. Harris*, 443 F.3d 822, 823–24 (11th Cir. 2006) (citation omitted). "[F]ailing to object does not trigger the doctrine," *United States v. Dortch*, 696 F.3d 1104, 1112 (11th Cir. 2012), *overruled in part on other grounds by*

*Alleyne v. United States*, 570 U.S. 99 (2013), but "when a party agrees with a court's proposed instructions, the doctrine of invited error applies, meaning that review is waived," *United States v. Frank*, 599 F.3d 1221, 1240 (11th Cir. 2010).

Here, Rodriguez didn't initially adopt the government's position on answering the jury's question, and he didn't object to the district court's answer. Two days later, Rodriguez moved to adopt the government's position that "a defendant can be found guilty of murder without the finding of racketeering." But he changed his mind the next day, withdrew his motion adopting the government's position, and, critically, "concede[d] that the [district court's] response to the jury's question [wa]s correct."

Because Rodriguez ultimately agreed with the district court's instruction, the invited error doctrine applies and precludes our review of the district court's response to the jury's question. *Id.*; *United States v. Feldman*, 931 F.3d 1245, 1260 (11th Cir. 2019) ("Under our precedent, when a party agrees with a court's proposed instructions, the doctrine of invited error applies, meaning that review is waived even if plain error would result." (cleaned up)); *United States v. Silvestri*, 409 F.3d 1311, 1337 (11th Cir. 2005) ("When a party responds to a court's proposed jury instructions with the words 'the instruction is acceptable to us,' such action constitutes invited error." (citation omitted)); *accord United States v. Fulford*, 267 F.3d 1241, 1246–47 (11th Cir. 2001).

*The district court's comment on Rodriguez's counsel's strategy*

Finally, Rodriguez argues that the district court abused its discretion by commenting in his presence on his counsel's motion to adopt the government's position regarding the jury question. Rodriguez argues that the district court's comments left him "questioning his attorney's allegiance," "adversely impacted" the attorney-client relationship by suggesting his counsel was ineffective, and "eroded" his confidence in his attorney. Because Rodriguez didn't object to the district court's comment, we again review for plain error. *See Rodriguez*, 398 F.3d at 1298.

The district court's isolated questioning of a strategic choice that Rodriguez's counsel later abandoned wasn't plain error because it didn't affect Rodriguez's substantial rights. *See id.* at 1299. To show the comments affected his substantial rights, Rodriguez had to "show a 'reasonable probability' that the error affected the outcome of the district court proceedings." *Iriele*, 977 F.3d at 1177 (quoting *Rodriguez*, 398 F.3d at 1299). But Rodriguez hasn't shown any reasonable probability that the district court's comments affected the outcome. The district court's comments came during deliberations and after the jury had heard all of the evidence and argument in the case. Because the district court's comments weren't made in the jury's presence, they couldn't have led the jury to conclude that the district court favored the government or disfavored Rodriguez and his counsel.

## CONCLUSION

The evidence against Rodriguez, Churchwell, and Thompson was legally sufficient.  The district court didn't plainly err in allowing Deputy Taylor to comment on Thompson's behavior during their encounters.  Nor did it plainly err in instructing the jury as to maintaining a drug distribution house.  And we find no reversible error in the district court's refusal to give Rodriguez's proposed justifiable use of deadly force instruction, in its response to the jury's question, or in its comments on Rodriguez's trial counsel's strategy.  Because there is no reversible error, we affirm the defendants' convictions.

**AFFIRMED.**